Ricky WYATT, by and through his aunt and legal guardian, Mrs. W. C. Rawlins, Jr., et al., for themselves jointly and severally and for all others similarly situated, Plaintiffs,

v.

Dr. Stonewall B. STICKNEY, as Commissioner of Mental Health and the State of Alabama Mental Health Officer, et al., Defendants,

United States of America et al., Amici Curiae.

Civ. A. No. 3195–N.

United States District Court, M. D. Alabama, N. D.

April 13, 1972.

George W. Dean, Jr., Destin, Fla., Jack Drake (Drake, Knowles & Still), Tuscaloosa, Ala., Reber F. Boult, Jr., Atlanta, Ga., Morton Birnbaum, Brooklyn, N.Y., for plaintiffs.

William J. Baxley, Atty. Gen., of Alabama, J. Jerry Wood, Asst. Atty. Gen., of Alabama, Montgomery, Ala., John J. ___n, Special Asst. Atty. Gen., of Al___ Birmingham, Ala., for defend-

___Ment, U. S. Atty., Middle District of Alabama, Montgomery, Ala., ___H. Johnson and David J. W. ___of, Civil Rights Division, U. S. ___Justice, Washington, D. C., ___hornton, Special Asst. U. S.

Atty., Middle District of Alabama, Montgomery, Ala., for the United States amici curiae.

Charles R. Halpern (Center for Law & Social Policy), James F. Fitzpatrick, Stephen M. Sacks, and Jeffrey D. Bauman (Arnold & Porter) Washington, D. C., Bruce Ennis (American Civil Liberties Union), New York City, Stanley Herr (NLADA National Law Office), Washington, D. C., Shelley Mercer (National Health and Environmental Program, School of Law, UCLA), Los Angeles, Cal., Paul Friedman (Center for Law and Social Policy), Washington, D. C., for other amici curiae.

## ORDER AND DECREE

JOHNSON, Chief Judge.

This class action originally was filed on October 23, 1970, in behalf of patients involuntarily confined for mental treatment purposes at Bryce Hospital, Tuscaloosa, Alabama. On March 12, 1971, in a formal opinion and decree, this Court held that these involuntarily committed patients "unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition." The Court further held that patients at Bryce were being denied their right to treatment and that defendants, per their request, would be allowed six months in which to raise the level of care at Bryce to the constitutionally required minimum. Wyatt v. Stickney, 325 F.Supp. 781 (M.D.Ala. 1971). In this decree, the Court ordered defendants to file reports defining the mission and functions of Bryce Hospital, specifying the objective and subjective standards required to furnish adequate care to the treatable mentally ill and detailing the hospital's progress toward the implementation of minimum constitutional standards. Subsequent to this order, plaintiffs, by motion to amend granted August 12, 1971, enlarged their class to include patients involuntarily

confined for mental treatment at Searcy Hospital [1] and at Partlow State School and Hospital for the mentally retarded. [2]

On September 23, 1971, defendants filed their final report, from which this Court concluded on December 10, 1971, 334 F.Supp. 1341, that defendants had failed to promulgate and implement a treatment program satisfying minimum medical and constitutional requisites. Generally, the Court found that defendants' treatment program was deficient in three fundamental areas. It failed to provide: (1) a humane psychological and physical environment, (2) qualified staff in numbers sufficient to administer adequate treatment and (3) individualized treatment plans. More specifically, the Court found that many conditions, such as nontherapeutic, uncompensated work assignments, and the absence of any semblance of privacy, constituted dehumanizing factors contributing to the degeneration of the patients' self-esteem. The physical facilities at Bryce were overcrowded and plagued by fire and other emergency hazards. The Court found also that most staff members were poorly trained and that staffing ratios were so inadequate as to render the administration of effective treatment impossible. The Court concluded, therefore, that whatever treatment was provided at Bryce was grossly deficient and failed to satisfy minimum medical and constitutional standards. Based upon this conclusion, the Court ordered that a formal hearing be held at which the parties and amici [3] would have the opportunity to submit proposed standards for constitutionally adequate treatment and to present expert testimony in support of their proposals.

Pursuant to this order, a hearing was held at which the foremost authorities on mental health in the United States appeared and testified as to the minimum medical and constitutional requisites for public institutions, such as Bryce and Searcy, designed to treat the mentally ill. At this hearing, the parties and amici submitted their proposed standards, and now have filed briefs in support of them. [4] Moreover, the parties

1. Searcy Hospital, located in Mount Vernon, Alabama, is also a State institution designed to treat the mentally ill. On September 2, 1971, defendants answered plaintiffs' amended complaint, as it related to Searcy, with the following language:

"Defendants agree to be bound by the objective and subjective standards ultimately ordered by this Honorable Court in this cause at both Bryce and Searcy."

This answer obviated the necessity for this Court's holding a formal hearing on the conditions currently existing at Searcy. Nevertheless, the evidence in the record relative to Searcy reflects that the conditions at that institution are no better than those at Bryce.

2. The aspect of the case relating to Partlow State School and Hospital for the mentally retarded will be considered by the Court in a decree separate from the present one.

3. The amici in this case, including the United States of America, the American Orthopsychiatric Association, the American Psychological Association, the American Civil Liberties Union, and the American Association on Mental Deficiency, have performed exemplary service for which this Court is indeed grateful.

4. On March 15, 1972, after the hearing in this case, plaintiffs filed a motion for further relief. This motion served, among other things, to renew an earlier motion, filed by plaintiffs on September 1, 1971, and subsequently denied by the Court, to add additional parties. That earlier motion asked that the Court add: "Agnes Baggett, as Treasurer of the State of Alabama; Roy W. Sanders, as Comptroller of the State of Alabama; Ruben King, as Commissioner of the Alabama Department of Pensions and Security, George C. Wallace as Chairman of the Alabama State Board of Pensions and Security, and James J. Bailey as a member of the Alabama State Board of Pensions and Security and as representative of all other members of the Alabama State Board of Pensions and Security; J. Stanley Frazer, as Director of the Alabama State Personnel Board and Ralph W. Adams, as a member of the Alabama State Personnel Board and as representative of all other members of the Alabama State Personnel Board."

and amici have stipulated to a broad spectrum of conditions they feel are mandatory for a constitutionally acceptable minimum treatment program. This Court, having considered the evidence in the case, as well as the briefs, proposed standards and stipulations of the parties, has concluded that the standards set out in Appendix A to this decree are medical and constitutional minimums. Consequently, the Court will order their implementation.[5] In so ordering, however, the Court emphasizes that these standards are, indeed, both medical and constitutional minimums and should be viewed as such. The Court urges that once this order is effectuated, defendants not become complacent and self-satisfied. Rather, they should dedicate themselves to providing physical conditions and treatment programs at Alabama's mental institutions that substantially exceed medical and constitutional minimums.

In addition to asking that their proposed standards be effectuated, plaintiffs and amici have requested other relief designed to guarantee the provision of constitutional and humane treatment. Pursuant to one such request for relief, this Court has determined that it is appropriate to order the initiation of human rights committees to function as standing committees of the Bryce and Searcy facilities. The Court will appoint the members of these committees who shall have review of all research proposals and all rehabilitation programs, to ensure that the dignity and the human rights of patients are preserved. The committees also shall advise and assist patients who allege that their legal rights have been infringed or that the Mental Health Board has failed to comply with judicially ordered guidelines. At their discretion, the committees may consult appropriate, independent specialists who shall be compensated by the defendant Board. Seven members shall comprise the human rights committee for each institution, the names and addresses of whom are set forth in Appendix B to this decree. Those who serve on the committees shall be paid on a per diem basis and be reimbursed for travel expenses at the same rate as members of the Alabama Board of Mental Health.

This Court will reserve ruling upon other forms of relief advocated by plaintiffs and amici, including their prayer for the appointment of a master and a professional advisory committee to oversee the implementation of the

The motion of September 1, 1971, also sought an injunction against the treasurer and the comptroller of the State paying out State funds for "non-essential functions" of the State until enough funds were available to provide adequately for the financial needs of the Alabama State Mental Health Board.

In their motion of March 15, 1972, plaintiffs asked that, in addition to the above-named State officials and agencies, the Court add as parties to this litigation Dr. LeRoy Brown, State Superintendent of Education and Lt. Governor Jere Beasley, State Senator Pierre Pelham and State Representative Sage Lyons, as representatives of the Alabama Legislature. The motion of March 15, 1972, also requested the Court to appoint a master, to appoint a human rights committee and a professional advisory committee, to order the sale of defendant Mental Health Board's land holdings and other assets to raise funds for the operation of Alabama's mental health institutions, to enjoin the construction of any physical facilities by the Mental Health Board and to enjoin the commitment of any more patients to Bryce and Searcy until such time as adequate treatment is supplied in those hospitals.

5. In addition to the standards detailed in this order, it is appropriate that defendants comply also with the conditions, applicable to mental health institutions, necessary to qualify Alabama's facilities for participation in the various programs, such as Medicare and Medicaid, funded by the United States Government. Because many of these conditions of participation have not yet been finally drafted and published, however, this Court will not at this time order that specific Government standards be implemented.

court-ordered minimum constitutional standards.[6] Federal courts are reluctant to assume control of any organization, but especially one operated by a state. This reluctance, combined with defendants' expressed intent that this order will be implemented forthwith and in good faith, causes the Court to withhold its decision on these appointments. Nevertheless, defendants, as well as the other parties and amici in this case, are placed on notice that unless defendants do comply satisfactorily with this order, the Court will be obligated to appoint a master.

■ Because the availability of financing may bear upon the implementation of this order, the Court is constrained to emphasize at this juncture that a failure by defendants to comply with this decree cannot be justified by a lack of operating funds. As previously established by this Court:

> "There can be no legal (or moral) justification for the State of Alabama's failing to afford treatment—and adequate treatment from a medical standpoint—to the several thousand patients who have been civilly committed to Bryce's for treatment purposes. To deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process." Wyatt v. Stickney, 325 F.Supp. at 785.

From the above, it follows consistently, of course, that the unavailability of neither funds, nor staff and facilities, will justify a default by defendants in the provision of suitable treatment for the mentally ill.

■ Despite the possibility that defendants will encounter financial difficulties in the implementation of this order, this Court has decided to reserve ruling also upon plaintiffs' motion that defendant Mental Health Board be directed to sell or encumber portions of its land holdings in order to raise funds.[7] Similarly, this Court will reserve ruling on plaintiffs' motion seeking an injunction against the treasurer and the comptroller of the State authorizing expenditures for nonessential State functions, and on other aspects of plaintiffs' requested relief designed to ameliorate the financial problems incident to the implementation of this order. The Court stresses, however, the extreme importance and the grave immediacy of the need for proper funding of the State's public mental health facilities. The responsibility for appropriate funding ultimately must fall, of course, upon the State Legislature and, to a lesser degree, upon the defendant Mental Health Board of Alabama. For the present time, the Court will defer to those bodies in hopes that they will proceed with the realization and understanding that what is involved in this case is not representative of ordinary governmental functions such as paving roads and maintaining buildings. Rather, what is so inextricably intertwined with how the Legislature and Mental Health Board respond to the revelations of this litigation is the very preservation of human life and dignity. Not only are the lives of the patients currently confined at Bryce and Searcy at stake, but also at issue are the well-

---

6. The Court's decision to reserve its ruling on the appointment of a master necessitates the reservation also of the Court's appointing a professional advisory committee to aid the master. Nevertheless, the Court notes that the professional mental health community in the United States has responded with enthusiasm to the proposed initiation of such a committee to assist in the upgrading of Alabama's mental health facilities. Consequently, this Court strongly recommends to defendants that they develop a professional advisory committee comprised of amenable professionals from throughout the country who are able to provide the expertise the evidence reflects is important to the successful implementation of this order.

7. See n. 4, supra. The evidence presented in this case reflects that the land holdings and other assets of the defendant Board are extensive.

being and security of every citizen of Alabama. As is true in the case of any disease, no one is immune from the peril of mental illness. The problem, therefore, cannot be overemphasized and a prompt response from the Legislature, the Mental Health Board and other responsible State officials, is imperative.

In the event, though, that the Legislature fails to satisfy its well-defined constitutional obligation, and the Mental Health Board, because of lack of funding or any other legally insufficient reason, fails to implement fully the standards herein ordered, it will be necessary for the Court to take affirmative steps, including appointing a master, to ensure that proper funding is realized [8] and that adequate treatment is available for the mentally ill of Alabama.

■ This Court now must consider that aspect of plaintiffs' motion of March 15, 1972, seeking an injunction against further commitments to Bryce and Searcy until such time as adequate treatment is supplied in those hospitals. Indisputably, the evidence in this case reflects that no treatment program at the Bryce-Searcy facilities approaches constitutional standards. Nevertheless, because of the alternatives to commitment commonly utilized in Alabama, as well as in other states, the Court is fearful that granting plaintiffs' request at the present time would serve only to punish and further deprive Alabama's mentally ill.

■ Finally, the Court has determined that this case requires the awarding of a reasonable attorneys' fee to plaintiffs' counsel. The basis for the award and the amount thereof will be considered and treated in a separate order. The fee will be charged against the defendants as a part of the court costs in this case.

To assist the Court in its determination of how to proceed henceforth, defendants will be directed to prepare and file a report within six months from the date of this decree detailing the implementation of each standard herein ordered. This report shall be comprehensive and shall include a statement of the progress made on each standard not yet completely implemented, specifying the reasons for incomplete performance. The report shall include also a statement of the financing secured since the issuance of this decree and of defendants' plans for procuring whatever additional financing might be required. Upon the basis of this report and other available information, the Court will evaluate defendants' work and, in due course, determine the appropriateness of appointing a master and of granting other requested relief.

Accordingly, it is the order, judgment and decree of this Court:

1. That defendants be and they are hereby enjoined from failing to implement fully and with dispatch each of the standards set forth in Appendix A attached hereto and incorporated as a part of this decree;

2. That human rights committees be and are hereby designated and appointed. The members thereof are listed in Appendix B attached hereto and incorporated herein. These committees shall have the purposes, functions, and spheres of operation previously set forth in this order. The members of the committees shall be paid on a per diem basis and be reimbursed for travel expenses at the same rate as members of the Alabama Board of Mental Health;

---

8. The Court understands and appreciates that the Legislature is not due back in regular session until May, 1973. Nevertheless, special sessions of the Legislature are frequent occurrences in Alabama, and there has never been a time when such a session was more urgently required. If the Legislature does not act promptly to appropriate the necessary funding for mental health, the Court will be compelled to grant plaintiffs' motion to add various State officials and agencies as additional parties to this litigation, and to utilize other avenues of fund raising.

3. That defendants, within six months from this date, prepare and file with this Court a report reflecting in detail the progress on the implementation of this order. This report shall be comprehensive and precise, and shall explain the reasons for incomplete performance in the event the defendants have not met a standard in its entirety. The report also shall include a financial statement and an up-to-date timetable for full compliance.

4. That the court costs incurred in this proceeding, including a reasonable attorneys' fee for plaintiffs' lawyers, be and they are hereby taxed against the defendants;

5. That jurisdiction of this cause be and the same is hereby specifically retained.

It is further ordered that ruling on plaintiffs' motion for further relief, including the appointment of a master, filed March 15, 1972, be and the same is hereby reserved.

## APPENDIX A

MINIMUM CONSTITUTIONAL STANDARDS FOR ADEQUATE TREATMENT OF THE MENTALLY ILL

I. *Definitions*:

a. "Hospital"—Bryce and Searcy Hospitals.

b. "Patients"—all persons who are now confined and all persons who may in the future be confined at Bryce and Searcy Hospitals pursuant to an involuntary civil commitment procedure.

c. "Qualified Mental Health Professional"—

(1) a psychiatrist with three years of residency training in psychiatry;

(2) a psychologist with a doctoral degree from an accredited program;

(3) a social worker with a master's degree from an accredited program and two years of clinical experience under the supervision of a Qualified Mental Health Professional;

(4) a registered nurse with a graduate degree in psychiatric nursing and two years of clinical experience under the supervision of a Qualified Mental Health Professional.

d. "Non-Professional Staff Member" —an employee of the hospital, other than a Qualified Mental Health Professional, whose duties require contact with or supervision of patients.

II. *Humane Psychological and Physical Environment*

1. Patients have a right to privacy and dignity.

2. Patients have a right to the least ✓ restrictive conditions necessary to achieve the purposes of commitment.

3. No person shall be deemed incompetent to manage his affairs, to contract, to hold professional or occupational or vehicle operator's licenses, to marry and obtain a divorce, to register and vote, or to make a will *solely* by reason of his admission or commitment to the hospital.

4. Patients shall have the same rights to visitation and telephone communications as patients at other public hospitals, except to the extent that the Qualified Mental Health Professional responsible for formulation of a particular patient's treatment plan writes an order imposing special restrictions. The written order must be renewed after each periodic review of the treatment plan if any restrictions are to be continued. Patients shall have an unrestricted right to visitation with attorneys and with private physicians and other health professionals.

5. Patients shall have an unrestricted right to send sealed mail. Patients shall have an unrestricted right to receive sealed mail from their attorneys, private physicians, and other mental health professionals, from courts, and government officials. Patients shall have a right to receive sealed mail from others, except to the extent that the Qualified Mental Health Professional responsible for formulation of a particular

patient's treatment plan writes an order imposing special restrictions on receipt of sealed mail. The written order must be renewed after each periodic review of the treatment plan if any restrictions are to be continued.

6. Patients have a right to be free from unnecessary or excessive medication. No medication shall be administered unless at the written order of a physician. The superintendent of the hospital and the attending physician shall be responsible for all medication given or administered to a patient. The use of medication shall not exceed standards of use that are advocated by the United States Food and Drug Administration. Notation of each individual's medication shall be kept in his medical records. At least weekly the attending physician shall review the drug regimen of each patient under his care. All prescriptions shall be written with a termination date, which shall not exceed 30 days. Medication shall not be used as punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the patient's treatment program.

7. Patients have a right to be free from physical restraint and isolation. Except for emergency situations, in which it is likely that patients could harm themselves or others and in which less restrictive means of restraint are not feasible, patients may be physically restrained or placed in isolation only on a Qualified Mental Health Professional's written order which explains the rationale for such action. The written order may be entered only after the Qualified Mental Health Professional has personally seen the patient concerned and evaluated whatever episode or situation is said to call for restraint or isolation. Emergency use of restraints or isolation shall be for no more than one hour, by which time a Qualified Mental Health Professional shall have been consulted and shall have entered an appropriate order in writing. Such written order shall be effective for no more than 24 hours and must be renewed if restraint and isolation are to be continued. While in restraint or isolation the patient must be seen by qualified ward personnel who will chart the patient's physical condition (if it is compromised) and psychiatric condition every hour. The patient must have bathroom privileges every hour and must be bathed every 12 hours.

8. Patients shall have a right not to be subjected to experimental research without the express and informed consent of the patient, if the patient is able to give such consent, and of his guardian or next of kin, after opportunities for consultation with independent specialists and with legal counsel. Such proposed research shall first have been reviewed and approved by the institution's Human Rights Committee before such consent shall be sought. Prior to such approval the Committee shall determine that such research complies with the principles of the Statement on the Use of Human Subjects for Research of the American Association on Mental Deficiency and with the principles for research involving human subjects required by the United States Department of Health, Education and Welfare for projects supported by that agency.

9. Patients have a right not to be subjected to treatment procedures such as lobotomy, electro-convulsive treatment, adversive reinforcement conditioning or other unusual or hazardous treatment procedures without their express and informed consent after consultation with counsel or interested party of the patient's choice.

10. Patients have a right to receive prompt and adequate medical treatment for any physical ailments.

11. Patients have a right to wear their own clothes and to keep and use their own personal possessions except insofar as such clothes or personal possessions may be determined by a Qualified Mental Health Professional to be dangerous or otherwise inappropriate to the treatment regimen.

12. The hospital has an obligation to supply an adequate allowance of clothing to any patients who do not have suitable clothing of their own. Patients shall

have the opportunity to select from various types of neat, clean, and seasonable clothing. Such clothing shall be considered the patient's throughout his stay in the hospital.

13. The hospital shall make provision for the laundering of patient clothing.

14. Patients have a right to regular physical exercise several times a week. Moreover, it shall be the duty of the hospital to provide facilities and equipment for such exercise.

15. Patients have a right to be outdoors at regular and frequent intervals, in the absence of medical considerations.

16. The right to religious worship shall be accorded to each patient who desires such opportunities. Provisions for such worship shall be made available to all patients on a nondiscriminatory basis. No individual shall be coerced into engaging in any religious activities.

17. The institution shall provide, with adequate supervision, suitable opportunities for the patient's interaction with members of the opposite sex.

18. The following rules shall govern patient labor:

A. *Hospital Maintenance* No patient shall be required to perform labor which involves the operation and maintenance of the hospital or for which the hospital is under contract with an outside organization. Privileges or release from the hospital shall not be conditioned upon the performance of labor covered by this provision. Patients may voluntarily engage in such labor if the labor is compensated in accordance with the minimum wage laws of the Fair Labor Standards Act, 29 U.S.C. § 206 as amended, 1966.

B. *Therapeutic Tasks and Therapeutic Labor*

(1) Patients may be required to perform therapeutic tasks which do not involve the operation and maintenance of the hospital, provided the specific task or any change in assignment is:

a. An integrated part of the patient's treatment plan and approved as a therapeutic activity by a Qualified Mental Health Professional responsible for supervising the patient's treatment; and

b. Supervised by a staff member to oversee the therapeutic aspects of the activity.

(2) Patients may voluntarily engage in therapeutic labor for which the hospital would otherwise have to pay an employee, provided the specific labor or any change in labor assignment is:

a. An integrated part of the patient's treatment plan and approved as a therapeutic activity by a Qualified Mental Health Professional responsible for supervising the patient's treatment; and

b. Supervised by a staff member to oversee the therapeutic aspects of the activity; and

c. Compensated in accordance with the minimum wage laws of the Fair Labor Standards Act, 29 U. S.C. § 206 as amended, 1966.

C. *Personal Housekeeping* Patients may be required to perform tasks of a personal housekeeping nature such as the making of one's own bed.

D. Payment to patients pursuant to these paragraphs shall not be applied to the costs of hospitalization.

19. *Physical Facilities*

A patient has a right to a humane psychological and physical environment within the hospital facilities. These facilities shall be designed to afford patients with comfort and safety, promote dignity, and ensure privacy. The facilities shall be designed to make a positive contribution to the efficient attainment of the treatment goals of the hospital.

A. *Resident Unit*

The number of patients in a multi-patient room shall not exceed six persons. There shall be allocated a minimum of 80 square feet of floor space per patient in a multi-patient room. Screens or curtains shall be provided to ensure privacy within the resident unit. Single rooms shall have a minimum of 100 square feet of floor space. Each patient will be fur-

nished with a comfortable bed with adequate changes of linen, a closet or locker for his personal belongings, a chair, and a bedside table.

### B. Toilets and Lavatories

There will be one toilet provided for each eight patients and one lavatory for each six patients. A lavatory will be provided with each toilet facility. The toilets will be installed in separate stalls to ensure privacy, will be clean and free of odor, and will be equipped with appropriate safety devices for the physically handicapped.

### C. Showers

There will be one tub or shower for each 15 patients. If a central bathing area is provided, each shower area will be divided by curtains to ensure privacy. Showers and tubs will be equipped with adequate safety accessories.

### D. Day Room

The minimum day room area shall be 40 square feet per patient. Day rooms will be attractive and adequately furnished with reading lamps, tables, chairs, television and other recreational facilities. They will be conveniently located to patients' bedrooms and shall have outside windows. There shall be at least one day room area on each bedroom floor in a multi-story hospital. Areas used for corridor traffic cannot be counted as day room space; nor can a chapel with fixed pews be counted as a day room area.

### E. Dining Facilities

The minimum dining room area shall be ten square feet per patient. The dining room shall be separate from the kitchen and will be furnished with comfortable chairs and tables with hard, washable surfaces.

### F. Linen Servicing and Handling

The hospital shall provide adequate facilities and equipment for handling clean and soiled bedding and other linen. There must be frequent changes of bedding and other linen, no less than every seven days to assure patient comfort.

### G. Housekeeping

Regular housekeeping and maintenance procedures which will ensure that the hospital is maintained in a safe, clean, and attractive condition will be developed and implemented.

### H. Geriatric and Other Nonambulatory Mental Patients

There must be special facilities for geriatric and other nonambulatory patients to assure their safety and comfort, including special fittings on toilets and wheelchairs. Appropriate provision shall be made to permit nonambulatory patients to communicate their needs to staff.

### I. Physical Plant

(1) Pursuant to an established routine maintenance and repair program, the physical plant shall be kept in a continuous state of good repair and operation in accordance with the needs of the health, comfort, safety and well-being of the patients.

(2) Adequate heating, air conditioning and ventilation systems and equipment shall be afforded to maintain temperatures and air changes which are required for the comfort of patients at all times and the removal of undesired heat, steam and offensive odors. Such facilities shall ensure that the temperature in the hospital shall not exceed 83°F nor fall below 68°F.

(3) Thermostatically controlled hot water shall be provided in adequate quantities and maintained at the required temperature for patient or resident use (110°F at the fixture) and for mechanical dishwashing and laundry use (180°F at the equipment).

(4) Adequate refuse facilities will be provided so that solid waste, rubbish and other refuse will be collected and disposed of in a manner which will prohibit transmission of disease and not create a nuisance or fire hazard or provide a breeding place for rodents and insects.

(5) The physical facilities must meet all fire and safety standards established

by the state and locality. In addition, the hospital shall meet such provisions of the Life Safety Code of the National Fire Protection Association (21st edition, 1967) as are applicable to hospitals.

19A. The hospital shall meet all standards established by the state for general hospitals, insofar as they are relevant to psychiatric facilities.

### 20. *Nutritional Standards*

Patients, except for the non-mobile, shall eat or be fed in dining rooms. The diet for patients will provide at a minimum the Recommended Daily Dietary Allowances as developed by the National Academy of Sciences. Menus shall be satisfying and nutritionally adequate to provide the Recommended Daily Dietary Allowances. In developing such menus, the hospital will utilize the Low Cost Food Plan of the Department of Agriculture. The hospital will not spend less per patient for raw food, including the value of donated food, than the most recent per person costs of the Low Cost Food Plan for the Southern Region of the United States, as compiled by the United States Department of Agriculture, for appropriate groupings of patients, discounted for any savings which might result from institutional procurement of such food. Provisions shall be made for special therapeutic diets and for substitutes at the request of the patient, or his guardian or next of kin, in accordance with the religious requirements of any patient's faith. Denial of a nutritionally adequate diet shall not be used as punishment.

### III. *Qualified Staff in Numbers Sufficient to Administer Adequate Treatment*

21. Each Qualified Mental Health Professional shall meet all licensing and certification requirements promulgated by the State of Alabama for persons engaged in private practice of the same profession elsewhere in Alabama. Other staff members shall meet the same licensing and certification requirements as persons who engage in private prac-

tice of their speciality elsewhere in Alabama.

22. a. All Non-Professional Staff Members who have not had prior clinical experience in a mental institution shall have a substantial orientation training.

   b. Staff members on all levels shall have regularly scheduled in-service training.

23. Each Non-Professional Staff Member shall be under the direct supervision of a Qualified Mental Health Professional.

### 24. *Staffing Ratios*

The hospital shall have the following minimum numbers of treatment personnel per 250 patients. Qualified Mental Health Professionals trained in particular disciplines may in appropriate situations perform services or functions traditionally performed by members of other disciplines. Changes in staff deployment may be made with prior approval of this Court upon a clear and convincing demonstration that the proposed deviation from this staffing structure will enhance the treatment of the patients.

| Classification | Number of Employees |
|---|---|
| Unit Director | 1 |
| Psychiatrist (3 years' residency training in psychiatry) | 2 |
| MD (Registered physicians) | 4 |
| Nurses (RN) | 12 |
| Licensed Practical Nurses | 6 |
| Aide III | 6 |
| Aide II | 16 |
| Aide I | 70 |
| Hospital Orderly | 10 |
| Clerk Stenographer II | 3 |
| Clerk Typist II | 3 |
| Unit Administrator | 1 |
| Administrative Clerk | 1 |
| Psychologist (Ph.D.) (doctoral degree from accredited program) | 1 |
| Psychologist (M.A.) | 1 |
| Psychologist (B.S.) | 2 |
| Social Worker (MSW) (from accredited program) | 2 |
| Social Worker (B.A.) | 5 |
| Patient Activity Therapist (M.S.) | 1 |
| Patient Activity Aide | 10 |
| Mental Health Technician | 10 |
| Dental Hygienist | 1 |

384

| Classification | Number of Employees |
|---|---|
| Chaplain | .5 |
| Vocational Rehabilitation Counselor | 1 |
| Volunteer Services Worker | 1 |
| Mental Health Field Representative | 1 |
| Dietitian | 1 |
| Food Service Supervisor | 1 |
| Cook II | 2 |
| Cook I | 3 |
| Food Service Worker | 15 |
| Vehicle Driver | 1 |
| Housekeeper | 10 |
| Messenger | 1 |
| Maintenance Repairman | 2 |

## IV. Individualized Treatment Plans

25. Each patient shall have a comprehensive physical and mental examination and review of behavioral status within 48 hours after admission to the hospital.

26. Each patient shall have an individualized treatment plan. This plan shall be developed by appropriate Qualified Mental Health Professionals, including a psychiatrist, and implemented as soon as possible—in any event no later than five days after the patient's admission. Each individualized treatment plan shall contain:

a. a statement of the nature of the specific problems and specific needs of the patient;

b. a statement of the least restrictive treatment conditions necessary to achieve the purposes of commitment;

c. a description of intermediate and long-range treatment goals, with a projected timetable for their attainment;

d. a statement and rationale for the plan of treatment for achieving these intermediate and long-range goals;

e. a specification of staff responsibility and a description of proposed staff involvement with the patient in order to attain these treatment goals;

f. criteria for release to less restrictive treatment conditions, and criteria for discharge;

g. a notation of any therapeutic tasks and labor to be performed by the patient in accordance with Standard 18.

27. As part of his treatment plan, each patient shall have an individualized post-hospitalization plan. This plan shall be developed by a Qualified Mental Health Professional as soon as practicable after the patient's admission to the hospital.

28. In the interests of continuity of care, whenever possible, one Qualified Mental Health Professional (who need not have been involved with the development of the treatment plan) shall be responsible for supervising the implementation of the treatment plan, integrating the various aspects of the treatment program and recording the patient's progress. This Qualified Mental Health Professional shall also be responsible for ensuring that the patient is released, where appropriate, into a less restrictive form of treatment.

29. The treatment plan shall be continuously reviewed by the Qualified Mental Health Professional responsible for supervising the implementation of the plan and shall be modified if necessary. Moreover, at least every 90 days, each patient shall receive a mental examination from, and his treatment plan shall be reviewed by, a Qualified Mental Health Professional other than the professional responsible for supervising the implementation of the plan.

30. In addition to treatment for mental disorders, patients confined at mental health institutions also are entitled to and shall receive appropriate treatment for physical illnesses such as tuberculosis.[1] In providing medical care, the State Board of Mental Health shall take advantage of whatever community-based facilities are appropriate and available and shall coordinate the patient's treatment for mental illness with his medical treatment.

1. Approximately 50 patients at Bryce-Searcy are tubercular as also are approximately four residents at Partlon.

31. Complete patient records shall be kept on the ward in which the patient is placed and shall be available to anyone properly authorized in writing by the patient. These records shall include:

a. Identification data, including the patient's legal status;

b. A patient history, including but not limited to:

(1) family data, educational background, and employment record;

(2) prior medical history, both physical and mental, including prior hospitalization;

c. The chief complaints of the patient and the chief complaints of others regarding the patient;

d. An evaluation which notes the onset of illness, the circumstances leading to admission, attitudes, behavior, estimate of intellectual functioning, memory functioning, orientation, and an inventory of the patient's assets in descriptive, not interpretative, fashion;

e. A summary of each physical examination which describes the results of the examination;

f. A copy of the individual treatment plan and any modifications thereto;

g. A detailed summary of the findings made by the reviewing Qualified Mental Health Professional after each periodic review of the treatment plan which analyzes the successes and failures of the treatment program and directs whatever modifications are necessary;

h. A copy of the individualized post-hospitalization plan and any modifications thereto, and a summary of the steps that have been taken to implement that plan;

i. A medication history and status, which includes the signed orders of the prescribing physician. Nurses shall indicate by signature that orders have been carried out;

j. A detailed summary of each significant contact by a Qualified Mental Health Professional with the patient;

k. A detailed summary on at least a weekly basis by a Qualified Mental Health Professional involved in the patient's treatment of the patient's progress along the treatment plan;

l. A weekly summary of the extent and nature of the patient's work activities described in Standard 18, *supra*, and the effect of such activity upon the patient's progress along the treatment plan;

m. A signed order by a Qualified Mental Health Professional for any restrictions on visitations and communication, as provided in Standards 4 and 5, *supra*;

n. A signed order by a Qualified Mental Health Professional for any physical restraints and isolation, as provided in Standard 7, *supra*;

o. A detailed summary of any extraordinary incident in the hospital involving the patient to be entered by a staff member noting that he has personal knowledge of the incident or specifying his other source of information, and initialed within 24 hours by a Qualified Mental Health Professional;

p. A summary by the superintendent of the hospital or his appointed agent of his findings after the 15-day review provided for in Standard 33 *infra*.

32. In addition to complying with all the other standards herein, a hospital shall make special provisions for the treatment of patients who are children and young adults. These provisions shall include but are not limited to:

a. Opportunities for publicly supported education suitable to the educational needs of the patient. This program of education must, in the opinion of the attending Qualified Mental Health Professional, be compatible with the patient's mental condition and his

treatment program, and otherwise be in the patient's best interest.

b. A treatment plan which considers the chronological, maturational, and developmental level of the patient;

c. Sufficient Qualified Mental Health Professionals, teachers, and staff members with specialized skills in the care and treatment of children and young adults;

d. Recreation and play opportunities in the open air where possible and appropriate residential facilities;

e. Arrangements for contact between the hospital and the family of the patient.

33. No later than 15 days after a patient is committed to the hospital, the superintendent of the hospital or his appointed, professionally qualified agent shall examine the committed patient and shall determine whether the patient continues to require hospitalization and whether a treatment plan complying with Standard 26 has been implemented. If the patient no longer requires hospitalization in accordance with the standards for commitment, or if a treatment plan has not been implemented, he must be released immediately unless he agrees to continue with treatment on a voluntary basis.

34. The Mental Health Board and its agents have an affirmative duty to provide adequate transitional treatment and care for all patients released after a period of involuntary confinement. Transitional care and treatment possibilities include, but are not limited to, psychiatric day care, treatment in the home by a visiting therapist, nursing home or extended care, out-patient treatment, and treatment in the psychiatric ward of a general hospital.

## V. Miscellaneous

35. Each patient and his family, guardian, or next friend shall promptly upon the patient's admission receive written notice, in language he understands, of all the above standards for adequate treatment. In addition a copy of all the above standards shall be posted in each ward.

## APPENDIX B

### BRYCE HUMAN RIGHTS COMMITTEE

1. Mr. Bert Bank—Chairman — P. O. Box 2149, Tuscaloosa, Alabama 35401
2. Ms. Ruth Cummings Bolden — 1414 9th Street, Tuscaloosa, Alabama 35401
3. Ms. Babs Klein Heilpern — 2526 Jasmine Road, Montgomery, Alabama 36111
4. Mr. Joseph Mallisham — 3028 20th Street, Tuscaloosa, Alabama 35401
5. Ms. Alberta Murphy — 13 Hillcrest, Tuscaloosa, Alabama 35401
6. Mr. Junior Richardson — 17 CW, Bryce Hospital, Tuscaloosa, Alabama 35401
7. Mr. John T. Wagnon, Jr. — 822 Felder Avenue, Montgomery, Alabama 36106

### SEARCY HUMAN RIGHTS COMMITTEE

1. Dr. E. L. McCafferty, Jr.—Chairman — 1653 Spring Hill Avenue, Mobile, Alabama 36604
2. Hon. James U. Blacksher — 304 South Monterey, Mobile, Alabama
3. Hon. Thomas E. Gilmore — P. O. Box 109, Eutaw, Alabama 35462
4. Ms. Consuello J. Harper — 3114 Caffey Drive, Montgomery, Alabama 36108
5. Hon. Horace McCloud — Mount Vernon, Alabama
6. Sister Eileen McLoughlin — 404 Government Street, Mobile, Alabama 36601
7. Ms. Joyce Nickels — c/o Searcy Hospital, Mount Vernon, Alabama