MAIN, Justice.
Amee Kozlovski, M.D., petitions this Court for a writ of mandamus directing the Mobile Circuit Court to enter a summary judgment in her favor in a wrongful-death action brought against her by David Shamlin, as administrator of the estate^ of Jeffery Brown,[1] deceased. ■ We grant the petition and issue the writ.
I. Facts and. Procedural History
In November 2011, following a physical attack on his father, David Brown, Jeffery Brown was involuntarily committed by the Mobile. Probate Court to Searcy Hospital, a long-term-care facility for mental illness operated by the Alabama Department of Mental Health. Brown was 19 years old at the time of his commitment and had a long history of mental illness and psychiatric hospitalizations.[2]
One particular problem associated with Brown’s mental illness was his tendency to run away from home. Brown’s father testified that Brown began running away from home in 2003. As Brown grew older, his impulse to run away became so pervasive that it was necessary to keep him under 24-hour supervision and to place alarms on his bedroom door and window to keep him from running away at night. When Brown did run away, he would sometimes be gone for days at a time, and when found he, would be malnourished and dehydrated. Brown also exhibited violent behavior and aggression toward his parents and others. This behavior also escalated as he grew older. In November 2011, Brown physically attacked his father. The incident resulted , in Brown’s arrest and his involuntary commitment to Searcy Hospital.
At Searcy Hospital Brown was assigned a “treatment team.” Dr. Kozlovski, a licensed physician and psychiatrist employed by • the' Alabama Department of Mental Health, was the head of Brown’s treatment team and was.responsible for making - the ultimate judgment about whether Brown met the criteria for discharge from Searcy Hospital. The treatment team also included a social worker, a licensed psychologist, a rehabilitation coordinator, and a registered nurse. A treatment plan was devised for Brown, and he was prescribed medication and received other mental-health treatment. During his time at Searcy Hospital, Brown had sever *447 al incidents of self-injurious, behavior but was otherwise folly compliant with his treatment. On April 5, 2012, the treatment team reached a consensus that Brown had met the conditions for discharge.[3] On May 18, 2012, despite reservations expressed by Brown’s family that he .would run away from a group-home facility, .Brown was discharged to Safe Haven, a group home owned and operated by Altapointe Health Systems, Inc. (“Alta-pointe”). Dr. Kozlovski approved the discharge. '
On May 19, 2012, Brown left Safe Haven without the knowledge of Safe Haven’s staff. On May 23, 2012, Brown’s body was found lying on a road in Mobile. Brown had apparently been struck and killed by a motorist.[4]
Shamlin, as the court-appointed administrator of Brown’s estate, initiated the underlying wrongful-death action in the Mobile Circuit Court, naming as defendants Dr. Kozlovski and Altapointe.[5] The complaint alleged that Dr. Kozlovski had been negligent and/or wanton in numerous respects. Shamlin’s complaint, as amended, alleged that Dr. Kozlovski:
“a. Negligently and/or wantonly failed to provide proper and/or adequate - treatment of [Brown’s] mental illness and psychological condition;
“b. Negligently and/or wantonly failed to properly assess and/or diagnose [Brown’s] mental illness and psychological condition;
“c. Negligently and/or wantonly failed to identify [Brown] as a flight risk;
“d. Negligently and/or wantonly failed to assess and/or diagnose [Brown’s] physical needs and/or requirements;
“e. Negligently and/or wantonly failed to determine whether [Brown] met the admission requirements of Safe Haven, a non-se'cure facility;
“f. Negligently and/or wantonly failed to determine whether Safe Haven had the capability to monitor and supervise [B,rown] at all times in order to prevent [Brown] from eloping, fleeing or escaping from Safe Haven;
“g. Negligently and/or. wantonly approved and authorized [Brown’s] release or discharge from Searcy Hospital, a secure facility, to Safe Haven, a non-secure facility; and
“[h]. Negligently, .and/or wantonly failed to advise, prescribe or otherwise convey that at the time of or prior to discharging [Brown] from her care at Searcy Hospital to Altapointe, [Brown] required ■ 24. hour ‘around the clock’ eyes-on supervision for at least-the-first week of his placement at Safe Haven Group Home.”
Shamlin also alleged that Dr. Kozlovski negligently and/or wantonly discharged Brown in violation of the Mobile Probate Court’s commitment order and that she negligently, and/or wantonly failed to conduct a suicide-risk assessment before discharging Brown.
*448 On September 18, 2014, Dr. Kozlovski filed a motion for a summary judgment, arguing that the claims against her were barred by the doctrine of State-agent immunity.[6] Shamlin filed a response in opposition to Dr. Kozlovski’s motion for a summaiy judgment, in. which he contended that Dr. Kozlovski had violated certain rules and regulations applicable to Brown’s release and was not, therefore, entitled to rely on the doctrine of State-agent immunity.[7] On December 12, 2014, the trial court denied Dr. Kozlovski’s motion, without explanation. On December 30, 2014, Dr. Kozlovski timely filed this petition for a writ of mandamus.
II. Standard of Review
“Although the denial of a motion for a summary judgment is generally not appealable, this Court has held that the denial of a motion for a summary judgment grounded on a claim of immunity is reviewable by a petition for a writ of mandamus. Ex parte Kennedy, 992 So.2d 1276, 1280 (Ala.2008). In such 'case, we apply the following standard of review:
“ ‘ “ “While the general rule is that the denial of a motion for summary judgment is not reviewable, ... the denial of a motion for summary judgment grounded on a claim of immunity is reviewable by petition for writ of mandamus.’ Ex parte Rizh, 791 So.2d 911, 912 (Ala.2000). A writ of mandamus is an extraordinary remedy available only when there is: “(a) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.’ Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001).” ’
“Kennedy, 992 So.2d at 1280 (quoting Ex parte Nall, 879 So.2d 541, 543 (Ala. 2003)).”
Ex parte Ruffin, 160 So.3d 750, 753 (Ala. 2014).
III. Analysis
Dr. Kozlovski .contends that the trial court erred in denying her motion for a summary judgment because, she argues, she is entitled to. State-agent immunity in this case. In response, .Shamlin argues that Dr. Kozlovski is not entitled to State-agent immunity from the wrongful-death claim because, he contends, Dr. Kozlovski’s actions, as related to Brown’s discharge from Searcy Hospital, violated several rules and regulations applicable to Dr. Ko-zlovski. For the reasons stated below, we agree that Dr. Kozlovski is immune from the wrongful-death claim asserted by *449 Brown’s estate, and we issue the writ of mandamus.
In Ex parte Cranman, 792 So.2d 392 (Ala.2000), a plurality of this Court restated the test for determining when a State employee is entitled to immunity as follows:[8]
“A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the .basis of the claim against the agent is based upon the agent’s
“(1) formulating plans, policies, or designs; or
“(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“(a) making administrative adjudications;
“(b) allocating resources;.
“(c) negotiating contracts;
“(d) hiring, firing, transferring, assigning, or supervising personnel; or
“(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons;[9] or
“(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing .prisoners, counseling or releasing persons of unsound mind, or educating students.
“Notwithstanding anything to the contrary in the: foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
“(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.”
.792 So.2d at 405 (second emphasis added). This Court has developed the following burden-shifting process applicable to the assertion of a State-agent-immunity defense:
“‘This Court has established a “burden-shifting” process when a party raises the defense of State-agent immunity.’ Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006). A State agent asserting State-agent immunity ‘bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity.’ 946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in Cranman is applicable. The exception being argued here is that ‘the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her. authority.’ 946 So.2d at 452. One of the ways in which a plaintiff can show *450 that a -State agent acted beyond his or her authority is by proffering evidence that the State agent failed ‘“to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.’” Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003) (quoting Ex parte Butts, 775 So.2d [173,] 178 [ (Ala. 2000) ]).”
Ex parte Kennedy, 992 So.2d 1276, 1282-83 (Ala.2008).
This case concerns the discharge from a mental hospital of a patient suffering from mental illness. Our Court has previously recognized the “complicated” determinations that must be made by State mental-health professionals in balancing the “dual duty they owe. to the public and to the individual' -patient” in making such discharge decisions. Barnes v. Dale, 530 So.2d 770, 784 (Ala.1988).
“The defendants owe a duty to the general public not to release a civilly committed patient until his treatment has been completed and he is no longer a threat to public safety and order.'.., However, the defendants, have a concomitant' duty to the patient, as demonstrated by the minimum constitutional guidelines of Wyatt [v. Stickney, 344 F.Supp. 373 (M.D.Ala.1972),] and Lynch [v. Baxley, 386 F.Supp. 378 (M.D.Ala. 1974) ]. The defendants must provide their patient a treatment program that achieves the purposes of confinement under the least restrictive conditions. They must provide him with intermediate and long-range treatment goals; and, if he fulfills those goals or no longer requires hospitalization in accordance with the standards for commitment, they must release him. Failure to do so exposes the defendants to liability for violating the patient’s right to due process of law.”
Barnes, 530 So.2d at 784-85. In light of the opposing duties to the public and the individual patient owed by State mental-health professionals in determining whether to discharge a patient, this Court’s restatement of State-agent immunity in Cranman expressly recognized that a State-agent “exercising judgment in the discharge of duties' imposed by statute, rule, or regulation in ... counseling or releasing persons of unsound mind” is entitled to immunity from claims resulting from the exercise of that judgment. 792 So.2d at 405.
In the present case, it is not disputed that, in discharging Brown from Searcy Hospital, Dr. Kozlovski, a psychiatrist employed by the Alabama Department of Mental Health, was engáging in a function that would entitle her to State-agent immunity under category (5) of the Cranman restatement. Accordingly, Dr. Kozlovski met her burden of demonstrating “that the plaintiffs claims arise from a function that would entitle the State agent to immunity.” Ex parte Estate of Reynolds, 946 So,2d 450, 452 (Ala.2006). Thus, the burden then shifted to Shamlin to demonstrate that one- of the two categories of exceptions to State-agent immunity applied. Reynolds, 946 So.2d at 452.
To this end, Shamlin argues that Dr. Kozlovski acted beyond her authority in discharging Brown from Searcy Hospital to the Safe Haven group home because, he says, she failed to comply with certain rules and regulations concerning the discharge of patients and “after-care” planning. See Ex parte Butts, 775 So.2d 173, 178 (Ala.2000); Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala.2003). Shamlin identifies two sets of rules and regulations governing the discharge of patients from Searcy Hospital: “Rules and Regulations of the Psychiatry and Medical Sections of the Organized Medical Staff of Searcy *451 Hospital” and “Written Plan for Client Care and Professional Services.” Dr. Ko-zlovski does not dispute the applicability of these rules and regulations.
First, Shamlin cites two paragraphs of the “Rules and Regulations of the Psychiatry and Medical Sections of the Organized Medical Staff of Searcy Hospital,” which provide:
“N. The patient’s discharge plan, initiated at admission, will be revised and updated throughout the hospital stay. The psychiatrist will participate with the treatment team in discharge planning, which is based on achieving treatment goals and geared toward restoring the patient to sufficiently improved psychiatric functioning to return to the community. The psychiatrist, along with the treatment team, will collaborate with the patient’s family, significant others, and community providers to establish discharge criteria and develop the specific components of an appropriate aftercare plan.
“0. The psychiatrist will evaluate the patient’s psychiatric condition at the time of discharge. A final progréss note will be entered in the medical record that addresses the patient’s potential for danger to self or others, including the absence of suicide or homicidal ideation. A final review of medications will be made and a 2-week supply of medication along with a prescription written for a 30-day supply of medications will be issued as part of the aftercare plan, unless clinically contraindicated. The final psychiatric diagnoses shall be recorded in the medical record.”
Shamlin next cites Searcy Hospital’s “Written Plan for Client Care and- Professional Services,” which provides,, in part:
“a. Psychiatric Services
“(1) Scope of Service: Psychiatric Services irresponsible for insuring that all clients admitted, evaluated or treated by any of the clinical services or facilities of the hospital receive appropriate, quality psychiatric care. Services provided include, but are not limited to, the following:
“(a) Coordinate ■ psychiatric service planning with other staff and provide service team leadership.
“(b) Approve all hospital releases. Participate in discharge and aftercare planning.
“(c) Evaluate/diagnose/treat/medicate ■clients in compliance with hospital standards.
“(d) Provide psychiatric opinion/consultation to other health professionals.
“(e) Participate in medical staff and hospital committees.
“(f) Complete . required documentation, including Axis I and II of the index of diagnosis, the Initial Treatment Plan, Psychiatric Evaluation, progress notes, and quarterly psychiatric updates.”
Finally, Shamlin cites another section of the ‘Written Plan for' Client Care 1 and Professional Services”:
“I. Discharge
“It is the policy of Searcy Hospital to discharge clients when they have met their individual criteria for discharge and when a less restrictive treatment environment is deemed therapeutically appropriate. This. decision is made by the treating psychiatrist in coordination with the other members of the treat *452 ment team, the client, the client’s family, and involved agencies, as appropriate. “Discharge planning begins when the client enters the hospital and continues to be a major component of the treatment. plan throughout the client’s hospitalization. At the time of admission, the client, the client’s family, and involved agencies, as appropriate, are consulted, and their views on discharge planning are recorded in the social history. ' The family of the client is informed of discharge planning as needed and at regularly scheduled Treatment planning conferences to which the family is invited. “There are á variety of placement options in addition to the client- returning home, such as group homes, foster homes, apartments, nursing homes, etc. The discharge plan is documented on the Post-Hospitalization Plan form at the time of the initial development of the Treatment plan and it is reviewed with each Treatment planning update and as needed.
“When the client is nearing discharge, outpatient follow-up care with the mental health center is arranged as appropriate. Prior to the client’s first appointment, and many times prior to scheduling a mental héalth center appointment, written information is exchanged with the mental health center via a continuity of care packet. This includes information regarding the diagnoses, brief treatment and hospital course to include course of medications, discharge mental status, recommendations for follow-up and a list of medications on which the client will be discharged. Discharge summaries and recommendation's for follow-up treatment of the client are sent to community mental health centers and/or private medical/psychiatric practitioners following discharge.”
Citing the deposition testimony of Dr. Kozlovski, in which she stated that Brown needed 24-hour supervision during his first week away from Searcy Hospital and at Safe Haven,[10] Shamlin contends that Dr. Kozlovski violated duties expressed in the above rules and regulations. Shamlin argues:
“Dr. Kozlovski failed to inform anyone, verbally or in writing, that [Brown] required 24-hour eyes on supervision during the fírst wéek following his discharge from Searcy Hospital to the Safe Haven Group Home. Dr. Kozlovski failed to develop, much less participate in developing, the specific components of [BrownJ’s aftercare plan. Dr. Kozlov-ski failed to cooperate with [Brown]’s family, discharging [Brown] to a nonse-cure residential group home. Dr. Ko-zlovski failed to coordinate psychiatric service/planning by discharging [Brown] to a nonsecure residential group home knowing that there was a ‘high probability’ .[Brown] would run away. Dr. Ko- *453 zlovski failed to cooperate with other ‘community providers’ (i.e., AltaPointé ... and/or the Safe Haven Group Home) in developing the specific components of an appropriate aftercare plan for [Brown].”
(Shamlin’s brief, at 17-18.) Thus, Shamlin argues that, in not following the rules and regulation's Searcy Hospital had in place for discharging patients, Dr. Kozlovski acted beyond her authority in discharging Brown to Safe Haven and that the trial court’s denial Dr. Kozlovski’s motion for a summary judgment grounded on State-agent immunity was proper. We disagree.
It is not apparent from the evidence in the materials before us that Dr. Kozlovski violated any of the rules, regulations, or policies Shamlin references. The evidence appears to be undisputed that Brown’s treatment team developed a discharge plan for Brown and that it subsequently determined that conditions for his discharge had been met. Shamlin claims Dr. Kozlovski failed to develop a proper “aftercare plan.” None of the materials before us, however, precisely defines what constitutes an “aftercare plan.” Nevertheless, it appears that Dr. Kozlovski complied with all the express requirements set forth in the above-referenced rules and regulations.
Dr. Kozlovski completed a “release instructions” form and a “release/discharge assessment” form for Brown.[11] In those forms she “evaluate[d] [Brown’s] psychiatric condition at the time of discharge” and provided a “discharge diagnosis.” The forms noted Brown’s medication, treatment, and “hospital course.” Dr. Kozlov-ski recommended that Brown was to continue taking his prescribed medications and to follow up with his primary-care physician once he was discharged. Further, Dr. Kozlovski signed off on a- “discharge medication list verification” form, which .listed Brown’s, prescribed medications- and provided instructions for Brown-to continue taking the listed medications. The medical records also indicate that Dr. Kozlovski entered a progress note that stated that Brown was not suicidal or homicidal at the* time of his discharge.
Nor is there any evidence indicating that Dr. Kozlovski failed to cooperate with Brown’s family in discharging Brown to Safe Haven. Brown’s family expressed concern regarding Brown’s discharge to a group home, and the family’s concern was noted in the file. Brown’s father testified that he attended and participated in treatment-team meetings concerning Brown’s discharge. This is not evidence indicating that Dr. Kozlovski refused to cooperate with the family or that she ignored the family’s concerns. To the contrary, it appears from the documents before us that Brown’s treatment team recognized and empathized with the family’s concerns- but determined that/based on its evaluation of Brown,' he had' met the criteria for discharge from Searcy Hospital.[12] Likewise, *454 there is no evidence indicating that Dr. Kozlovski failed to cooperate with “community providers” regarding Brown’s discharge criteria or-after-care plan.
To be sure, this is a difficult cáse. The concerns of Brown’s family regarding Brown’s discharge from Searcy Hospital, unfortunately, proved justified. But it is nonetheless undisputed that Dr. Kozlovski, in making a judgment concerning Brown’s discharge, was “discharging duties imposed by statute, rule, or regulation .:. in releasing [a person] of unsound mind..!. Cranman, 792 So.2d at 405. We cannot say from the materials before us that Dr. Kozlovski “failed to discharge [her] duties pursuant to detailed rules or regulations, such as those stated on a checklist.” Ex parte Butts, 776 So.2d at 178. Nor can we say that her decision to approve Brown’s discharge was made “willfully, maliciously, fraudulently, in bad" faith, beyond [her] authority, or under a mistaken interpretation of the law_” Cranman, 792 So.2d at 405. Accordingly, Shámlin has not met his burden to establish that, in discharging Brown from Searcy Hospital to Safe Haven, Dr. Kozlovski acted “beyond ... her authority.” Therefore, Dr. Kozlovski is entitled to State-agent immunity.
IV. Conclusion
Based on the materials before us, Dr. Kozjovski is entitled to Stateragent immunity from the wrongful-death action asserted against her by Shamlin, as administrator of Brown’s estate. Accordingly, she has shown a clear legal right to the relief sought, and the trial court is directed to enter a summary judgment in her favor.
PETITION GRANTED; WRIT . ISSUED.
MOÓRE, C.J., and STUART, BOLIN, SHAW, WISE, and BRYAN, JJ., concur.
PARKER, J,, dissents.

. The decedent’s name is spelled three ways in the materials before this Court: Jeffery, Jeffrey, and Jefferey, We have chosen to use the spelling used by the respondent.

. Brown had been diagnosed as suffering from numerous conditions ánd mental ill- • nesses, including pervasive developmental disorder, oppositional defiant disorder, bipolar- disorder, conduct disorder, Asperger's syndrome, schizoaffective disorder, adjustment disorder, psychotic disorder, dysthymia, generalized anxiety disorder, and schizophrenia.

.The progress notes for that date state:
"Mr. Brown is not suicidal or homicidal, and it is noteworthy that Mr. Brown has met criteria for discharge, has been accepted for Group Home Placement and is waiting for bed space.”
Likewise, the progress notes from May. 17, 2012, state:
"[Brown] reports desire to be placed in Group Home setting. [Brown] continues to meet discharge criteria....”

. The incident is characterized in .the record as a "hit-and-run.” Shamlin contends that Brown’s death was a suicide.

. Altapointe is not a party to this petition.

. The complaint does not state whether Dr. - Kozlovski was sued in her official or individual capacity. Dr. Kozlovski correctly argues that any claims asserted against her in her official capacity are barred by the doctrine of sovereign immunity. See Ala. Const. 1901, § 14; Ex parte Department of Mental Health & Mental Retardation, 937 So.2d 1018, 1023 (Ala.2006); and Ex parte Department of Mental Health & Mental Retardation, 837 So.2d 808, 811 (Ala.2002). Shamlin does not respond to Dr. Kozlovski’s official-capacity argument, and his arguments before this Court are limited solely to the issue whether Dr. Kozlovski is entitled to State-agent immunity. Thus, we assume that his claims against Dr. Kozlovski are asserted against her in only her individual capacity.

. Shamlin’s response is limited to assertions that Dr. Kozlovski's actions in discharging Brown to Safe Haven violated certain rules and regulations applicable to Dr. Kozlovski. To the extent that his complaint alleged theories of recovery against Dr. Kozlovski based on actions not directly related to Brown’s discharge from Searcy Hospital, those claims appear to have been abandoned.

. The test set out in Cranman was subsequently adopted by a majority of the Court in Ex parte Butts, 775 So.2d 173 (Ala.2000);

. Following Cranman, category (4) was further clarified. See Hollis v. City of Brighton, 950 So.2d 300 (Ala.2006).

. Dr. Kozlovski testified as follows during her deposition:
"Q: ... [D]id [Brown] need any supervision at all once he left Searcy?
“A: He needed supervision, yes, sir.
[[Image here]]
"Q: Did he need round-the-clock supervision?
“Á: I don’t think so..,. At least the first week, he1 get to know people there and build some trust with - his new environment.
"Q: So fhe first week he needed round-the-clock supervision?
[[Image here]]
"A: Yes, sir. I would say- since it’s a new environment, he would [need] supervision around the clock, until he got adjusted. - :
"Q: And does that mean somebody keeping their eyes on him around the clock?
[[Image here]]
"A: Yes, sir.”

. The information categories on those pre-printed forms generally appear to correspond to the categories of information required to be provided by the psychiatrist upon a patient’s discharge according to the “Rules and Regulations of the Psychiatry and Medical Sections of the Organized Medical-Staff of Searcy- Hospital” and the "Written Plan for Client Care and Professional Services.”

. For example, Brown’s file contained the following progress note:
"Social Worker contacted client's father, David Brown, to inquire about recent meeting with AltaPointe Health System’s Transitional Living Home. Father reports meeting went well and home appears, to be good location with several positive services. Father reports concerns over client’s history of suicidal behaviors and elopement. Father reports group home does, not appear to have adequate security to prevent elopement. Social Worker empathized- with father’s concerns and informed father that *454 treatment team has evaluated client [and client] is currently free of any suicidal ideation and/or behaviors. Client has reported ‘good’ mood for several weeks and is able to maintain ground privileges successfully without any attempts at elopement. Father reports agreement with treatment team assessment, however continues to report apprehension regarding client's release. Father states 'he seems happy in the hospital and I don’t see a need for him to have a discharge.’ Social worker reported that father’s concerns will be further discussed with treatment team and social worker to follow up with father.”
A follow-up progress note stated:
“Social Worker contacted client's father to provide progress update. Father informed of recent interview of AltaPointe Health Systems for group home placement. Client presented well in interview and was accepted for placement at this time awaiting bed availability. Father reports understanding and agreement with client’s discharge plans.”