Ricky WYATT, By and Through His Aunt and Legal Guardian, Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,

Diane Martin, et al., Plaintiff–Intervenors,

v.

Royce G. KING, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants,

United States of America, et al., Amici Curiae.

Civ. A. No. 3195–N.

United States District Court, M.D. Alabama, N.D.

May 14, 1992.

Ira Burnim, Washington, D.C., for proposed intervenor Bretz.

R. Emmett Poundstone, III, and Ricky Trawick, Alabama Dept. of Mental Health, Montgomery, Ala., Joel Kline, and Christopher Cerf, Washington, D.C., for King and Dept. of Mental Health.

R. David Christy, Montgomery, Ala., for King.

Andrew J. Barrick and Mitchell W. Dale, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for the U.S.

Byrd R. Latham, Patton, Latham, Legge & Cole, Athens, Ala., for Gunter, Steagall and Brassell.

David Ferleger, Philadelphia, Pa., Reuben Cook, Edward Stevens, Victoria Farr, and Donald Tipper, Tuscaloosa, Ala., for intervenors Martin, et al.

Peter G. Thompson, Sandra Lord, Washington, D.C., for Ricky Wyatt, et al.

Pamela Chen, U.S. Dept. of Justice, Civ. Rights Div., Sp. Litigation Section, Washington, D.C., for amicus curiae U.S.

Algert Agricola, Mark Montiel, and David Byrne, Montgomery, Ala., for State defendants.

## MEMORANDUM OPINION AND ORDER

MYRON H. THOMPSON, Chief Judge.

In 1972, as a result of a class-action lawsuit brought on behalf of patients involuntarily committed to the custody and care of the Alabama Department of Mental Health and Mental Retardation, this court ordered departmental officials to comply with certain minimal constitutional standards in the provision of care to the mentally ill. *See Wyatt v. Stickney*, 344 F.Supp. 373 (M.D.Ala.1972), *aff'd in part*, 503 F.2d 1305 (5th Cir.1974). Although this litigation has undergone numerous developments since that time, these *"Wyatt* standards" for the mentally ill have remained largely unchanged since their adoption. Last year, the parties sought court approval of two consent decrees that proposed to modify several of the *Wyatt* standards. At that time, primarily because of the apparent lack of support for the consent decrees among the state's mental health consumers and their advocates, the court required the parties "to clarify or change the decrees where necessary and to submit additional evidence in support of the decrees." *Wyatt v. King*, 793 F.Supp. 1053, 1057 (M.D.Ala.1991). The parties, with the support of numerous mental health organizations, have now submitted three new consent decrees for the court's approval. For the reasons that follow, the court will ap-

prove the entry of these new consent decrees.[1]

## I.

It is well established that parties who seek to resolve a class action through settlement must first convince the court that the proposed settlement agreement constitutes a "fair, adequate and reasonable" resolution of the dispute.[2] *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983);[3] *see also* Fed.R.Civ.P. 23(e) (requiring judicial approval of any settlement negotiated in class action). Although the court will accord some deference to the opinion of class counsel, the court retains an independent obligation to ensure that counsel is acting in the best interest and with the support of his or her class. *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1217–18 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Paradise v. Wells*, 686 F.Supp. 1442, 1444 (M.D.Ala. 1988).

When parties to a consent decree subsequently propose to amend that decree, the trial court similarly must examine evidence submitted by the parties to determine whether the proposed modification is justified. It is the court's responsibility to "discern the underlying purpose of the decree and decide whether modification would be consistent with that purpose." *Hodge v. Dept. of Housing & Urban Dev't.*, 862 F.2d 859, 864 (11th Cir.1989) (per curiam); *see also Heath v. DeCourcy*, 888 F.2d 1105, 1110 (6th Cir.1989) (in institutional reform litigation, court considers whether parties have identified "defect or deficiency" in district court's original decree which impedes achieving decree's goals). Again, the fact that class counsel supports the proposed modifications is an important factor in the court's inquiry but is not the

only relevant consideration; the court must still undertake an independent evaluation of the evidence submitted before lending the authority of the federal court to the agreement fashioned by the parties.

In this case, in January 1991, counsel for the plaintiff class and counsel for the defendants first jointly petitioned the court for approval of modifications to the existing *Wyatt* standards. The 35 standards address a broad spectrum of conditions and requirements, governing virtually every area of patient life within the state's mental health institutions, from showers to psychiatrist staffing ratios, from "electro-convulsive treatment" to therapeutic labor. Through two consent decrees, the parties proposed to amend ten of these 35 standards, including those governing the administration of electro-convulsive treatment and the use of "seclusion and physical restraint."

At that time, the court examined the decrees, reviewed the arguments presented by counsel in support of their adoption, and encouraged interested parties to present the court with their views on the proposed changes. As a result of this process, it became clear to the court that counsel for the plaintiff class had failed to take sufficient steps—or, it appeared, any steps whatsoever—to solicit comments from class members and their advocacy organizations during the development of the decrees. At the fairness hearing, counsel were unable to present any evidence that would indicate the support of class members for these revisions. On the contrary, the court heard from numerous mental health consumers and their advocacy organizations who expressed strong criticisms of the proposed modifications. In addition, the court had its own questions about the application of the proposed decrees and the impact on current practices at state facili-

---

1. With the submission of the three new decrees, the court entered a final order rejecting the two original decrees. *Wyatt v. King*, civil action no. 3195–N (M.D. Ala. Oct. 28, 1991).

2. The court also has a duty to ensure that the settlement is not illegal, against public policy, or the product of fraud or collusion. *Dillard v. Crenshaw County*, 748 F.Supp. 819, 823 (M.D.Ala.1990). No one has leveled such a

charge against the three new proposed decrees, and the court is unaware of any evidence which would support such a charge.

3. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

ties. Because counsel had failed to present sufficient evidence to establish that the modifications were necessary to remedy a deficiency in the standards as they existed or that the proposed changes would be in the "best interest" of the class, the court refused to approve these decrees. *Hodge*, 862 F.2d at 861–64. The court directed counsel for plaintiffs and defendants to gather additional evidence in support of the decrees and to clarify or change the decrees as necessary to obtain wider support from the class members and their representatives. 793 F.Supp. at 1057.[4]

The three new consent decrees currently before the court differ in many respects from those submitted to the court previously; most importantly, these decrees, unlike the earlier versions, now appear to have the support of a large segment of the mental health community. This is primarily due to the efforts of counsel for the plaintiff class and counsel for defendants to involve the state's primary and secondary consumers,[5] consumer organizations, and advocacy groups—including counsel for the plaintiff-intervenors in this case—in the revision of the decrees.[6] Counsel for the parties circulated copies of the proposed decrees to these various groups and individuals for their inspection and comment, and encouraged them to submit written comments or affidavits to the court and to make their views known at the fairness hearing. Throughout the weeks preceding the fairness hearing on the three new decrees, the court continued to receive revisions as counsel for the parties sought to respond to comments and criticisms they received.

The willingness of counsel for the parties to address the concerns of their critics has had two very positive results: first, the decrees now before the court have the support of the state's major mental health advocacy organizations; and, second, upon reviewing the decrees, the court finds that they are much improved substantively as a result of the numerous revisions.[7] The court is confident that enactment of these proposed modifications will improve the standard of care for patients committed to the state's mental health facilities and thus better promote the underlying purpose of the original *Wyatt* order. *Hodge*, 862 F.2d at 864. The following section offers a general discussion of the existing standards and the more salient modifications advanced in the three proposed consent decrees.[8]

## II.

### A. *The First Consent Decree*

(Standards 21, 23, 26–29, 31, and 33)

The first of the proposed consent decrees would alter *Wyatt* standards 21, 23, 26–29,

4. *See* note 1, *supra*.

5. "Primary" consumers are mental health patients themselves; "secondary" consumers are the families and friends of mental health patients who are affected by the standard of state mental health services.

6. The plaintiff-intervenors, who are seeking to represent those members of the *Wyatt* plaintiff class who are involuntarily confined at the Thomasville Adult Adjustment Center, have also participated in the settlement process. Although not directly involved in this phase of the litigation, their counsel are familiar with the implementation of the *Wyatt* standards at the Thomasville facility and have provided the parties and the court with useful insight into the possible impact of the proposed revisions on patients at that facility. Plaintiff-intervenors' counsel have also assisted by suggesting amendments to the *Wyatt* standards designed to ensure the timely identification and discharge of pa-

tients who no longer meet commitment criteria. *See Wyatt v. King*, 773 F.Supp. 1508 (M.D.Ala. 1991).

7. In a previous order, the court wrote that it "understands the difficulties class counsel faces in endeavoring to solicit the views" of "his clients—who consist only of current patients confined in state mental health facilities." 793 F.Supp. at 1055–56. Counsel for the plaintiff class, Mr. Ira Burnim, is to be strongly commended for the sensitive and effective manner in which he has involved many affected and interested persons in the settlement proceedings.

8. The three decrees now before the court address the same standards that the parties' counsel sought to modify in the original two decrees. The "addition" of a third decree results from counsel's decision to submit the revised standard on seclusion and restraint and the revised electroconvulsive treatment standard as two separate decrees.

31, 33, and the definitional section of the standards. These revisions address two of the three issues identified by the original *Wyatt* court as areas of "fundamental" concern: "qualified staff in numbers sufficient to administer adequate treatment," and the "individualized treatment plans." 344 F.Supp. at 375. In addition, the decrees change some of the terminology used in the standards to account for the new facilities that have been created since 1972.

### i. *Clarification of definitions*

■ In 1972, when the court promulgated the original *Wyatt* standards, Bryce and Searcy Hospitals housed the State of Alabama's involuntarily-committed mentally ill patients. Accordingly, the court applied the minimum treatment standards for such patients to "hospitals." *See Wyatt*, 344 F.Supp. at 379–386 (standards 18(A), 19(F) & (G), & 24). Since 1972, however, the state has established additional mental health institutions, some of which, such as the Eufaula Adolescent Center and the Thomasville Adult Adjustment Center, are not designated as hospitals. The parties therefore have proposed amending the *Wyatt* standards to make clear that the standards for treatment of people with mental illness apply not only to "hospitals" but to all state-operated "facilities." The list of institutions specifically identified as hospitals is also updated to include North Alabama Regional Hospital and Greil Memorial Hospital. Finally, the proposed decree would specify that any reference to "patients" includes not only hospital patients but all those individuals involuntarily committed to any state facility.

### ii. *"Qualified mental health professionals" or "QMHP's"*

■ One of the central concerns animating the court's adoption of the original *Wyatt* standards was the lack of adequate

qualifications among the departmental employees involved in the care of patients committed to the state's mental health institutions. *See Wyatt v. Stickney*, 325 F.Supp. 781, 783 (M.D.Ala.1971). Accordingly, in its 1972 order, the court obligated state officials to provide mental health treatment to these residents through properly trained and experienced staff. In particular, the court created four categories of "qualified mental health professionals" or "QMHP's," authorized by the *Wyatt* standards to plan and administer treatment.[9]

In earlier proposals, the plaintiffs and defendants sought to expand the definition of QMHP's substantially, to include a wider range of social workers, nurses, and doctors. In response to strenuous objections from consumer advocacy groups, the parties have limited the expansion to the addition of two categories of "psychological associates." These psychological associates would be psychologists with master's degrees and two years of clinical experience under the supervision of a doctoral level clinical psychologist who fall in one of the two following groups: (1) those with master's degrees from accredited clinical programs providing specialized training in abnormal behavior, and (2) those with degrees in another area of psychology, but who have received training in abnormal behavior and are employed in one of the covered state institutions on the date the decree takes effect. Plaintiffs' counsel has indicated that this expansion will have limited impact on patient care, as master's level psychologists already perform many of the tasks of a QMHP at state facilities. Their explicit inclusion as QMHP's will permit them, when appropriate, to approve formally treatment plans and to approve certain orders in the plans regarding visitation, mail and telephone communication, wearing personal clothing and keeping and using personal items.

9. Under the existing standard, the following four groups may serve as QMHP's: (1) psychiatrists with three years of residence training in psychiatry; (2) psychologists with doctoral degrees from accredited programs; (3) social workers with master's degrees from accredited programs and two years of clinical experience under the supervision of a QMHP; and (4) registered nurses with graduate degrees in psychiatric nursing and two years of clinical experience under the supervision of a QMHP. *See Wyatt*, 344 F.Supp. at 379.

The revised standards also change the terminology used to refer to staff who are not QMHP's as "non-QMHP" staff instead of "non-professional" staff.

### iii. *Licensing and certification requirements for QMHP's*

█ The existing standard 21 mandates that both QMHP's and non-QMHP's in each field shall meet all licensing and certification requirements promulgated by the state for their profession or specialty. The proposed decree would amend this standard to clarify the QMHP status of certain social workers and to permit certain psychiatrists who are awaiting full licensure to serve as QMHP's for a period of one year. The decree would also revise standard 23, which requires that each non-QMHP be supervised by a QMHP, to specify that the supervisor must be a QMHP "appropriate to the work assignment and professional discipline" of the non-QMHP staff member.

### iv. *Individualized treatment plans*

The first consent decree proposes several changes in the existing standards governing the development, implementation, supervision and review of patient treatment plans by mental health staff. Structurally, the modifications would consolidate existing standards 26 through 29 and 33 into a single standard. Substantively, the revisions incorporate recommendations made by consumers and advocates to ensure that patients understand their treatment goals and that these goals relate to the criteria for discharge.

### (a) Development of the individualized treatment plan

█ Standard 26 of the court's 1972 order required that an individual treatment plan for each patient be developed by "appropriate Qualified Mental Health Professionals, including a psychiatrist." *Wyatt,* 344 F.Supp. at 384. The revised standard clarifies that treatment plans must be developed by "an assigned Treatment Team," and that teams within hospitals must be headed by a psychiatrist and those in geriatric programs and in the Thomasville Ad-justment Center and the Eufaula Adolescent Center by "an appropriate QMHP." The existing standard 33 allows 15 days for the creation of an individualized treatment plan. As revised, the standard now requires that a member of the treatment team examine the patient and develop an interim treatment plan within 72 hours of admission. The treatment team would have ten days to develop and implement a fully individualized plan.

The revised standard also adds to the elements which must be included in each patient's individualized treatment plan. In addition to the information already required, the treatment plan must include: "a statement of the patient's strengths including skills and interests," "an assessment by medical staff of any restrictions or limitations on physical activity," and intermediate and long-range treatment goals. Criteria for release to less restrictive treatment conditions and criteria for discharge must be "specific and measurable," must be "written in nontechnical language," and must be "explained to the patient in a manner appropriate to the patient's capacity to understand." The intermediate and long-term treatment goals must be clearly stated and "must relate to involuntary commitment criteria"; similarly, criteria for release must "relate to involuntary commitment standards." As part of the treatment plan, the treatment team must also develop an individualized discharge plan that identifies the different services the patient will require upon discharge.

### (b) Supervision of treatment

█ The revised standard specifies that, once a plan has been developed that includes all of these elements, a QMHP and a psychiatrist must bear responsibility for overseeing the implementation of the treatment plan, integrating the various components, reviewing the plan regularly, and recording the patient's progress. As before, the QMHP bears responsibility for ensuring that the patient is released to a less restrictive form of treatment when appropriate; in addition, however, the revised standard requires the QMHP to see

that, upon discharge, the patient receives the appropriate transitional services.

### (c) Progress summaries

■ The parties have also agreed to alter the requirements concerning the entry of progress summaries and the review of treatment plans. For most patients, the revision does not affect the current standard's requirement of weekly progress summaries by a QMHP but simply recasts this requirement as a "minimum" and instructs the QMHP to update the report more frequently as necessary, that is, "on a regular and periodic basis ... as dictated by good clinical judgment." For patients in long-term treatment programs and geriatric patients, the standards would instead require only monthly progress summaries. Added is a requirement that progress summaries include a "medication review" that monitors the efficacy of any prescribed medication and the presence of unintended side effects.

### (d) Review and modification of treatment plans

■ The revised standard seeks to regularize the review of treatment plans to ensure that appropriate modifications may be made in a timely fashion. Currently, standard 29 requires "continuous" review, and modifications "if necessary," but offers no precise guidance beyond the requirement that a review be conducted at least every 90 days. The revised standard specifies that a patient's treatment plan is to be reviewed "at major key decision points in the patient's treatment, including: at the time of admission, transfer, and discharge; when there is a major change in the patient's condition; at the point of estimated length of treatment and thereafter based on that estimated length of treatment;" and, at a minimum, every 90 days. Modifications are to be made by the treatment teams "as the need becomes evident through regular and periodic reviews."

Because the new standards provide for a treatment team, rather than an individual QMHP, to develop and implement the treatment plan, the requirements that a patient periodically receive a mental examination from a QMHP other than the professional responsible for his or her care, and that a non-attending QMHP review the treatment plan, have both been eliminated.

### (e) Quality assurance and utilization review

■ To ensure that the theoretical benefits of the improved standards are realized in practice, the parties have fashioned a new standard requiring each mental health facility to maintain a "quality assurance program," to guarantee that treatment plans are reviewed in accordance with accreditation standards, and a "utilization review program," to screen patients to determine whether they have been appropriately admitted and to reexamine periodically each patient's need for continued inpatient treatment. The latter provision would replace an existing standard that requires the superintendent of a hospital to examine a patient and decide whether the patient requires hospitalization within 15 days of the patient's admission. In its stead, the revised standard mandates that the need for continued inpatient treatment be determined according to a schedule based on the average length of stay for the unit or program in which the patient is being treated. If the data for the patient's individual unit or program are not "readily available," the staff may use instead length of stay data for the entire facility.[10] As part of the admissions screen and the continued stay reviews, the facility must document the specific basis supporting its determination that a patient requires admission or continued institutional care.

The revised standard takes the important step of clarifying the facility's obligation to terminate the involuntary commitment of

---

**10.** Plaintiff-intervenors repeatedly expressed concern that calculations of the average length of stay for the facility as a whole would bias the length of stay toward longer periods of hospitalization, as the high volume and fast turnover of the admissions unit would obscure the actual length of stay on the long-term unit. The current proposal seeks to accommodate this concern where such data are available.

patients who do not meet commitment standards. If, as a result of the admissions screen or a continued stay review, the facility determines that the patient does not meet the standards for involuntary commitment, "the patient must be released immediately unless he or she agrees to continue on as a voluntary patient." The revised standard similarly requires that if, at any point during a patient's stay, the facility director or the director's appointed representative determines that the patient no longer meets the criteria for involuntary commitment, the patient must be discharged immediately, unless he or she decides to stay on as a voluntary patient, and must be provided with the appropriate transitional services.

### v. *Patient records*

■ The parties propose to modify standard 31, which concerns patient records, to emphasize the importance of the confidentiality of patient records and to clarify that this must be protected "through strict adherence to applicable statutes and rules." The revised decree would also modify the current requirement that all individuals seeking access to a patient's record must first obtain written authorization from the patient or the patient's guardian. The revised standard identifies a limited number of individuals, including the patient's attorney, authorized Department employees, and, to the extent legally authorized, the Alabama Disabilities Advocacy Program, who need not obtain a formal written consent in order to examine a patient's records. The standard also affirms that a patient must have access to his or her own records.

In response to comments and recommendations submitted by consumers, the new standard adds the requirement that any complaint about a patient that is recorded in the patient's record be discussed with the patient, and that the patient's response be documented along with the complaint. The requirement that complete patient records be kept on the patient's ward has been deleted.

### B. *The Second Consent Decree: Seclusion and Restraint*

### (Standard 7)

Among the most rigorous procedural protections adopted by the court in its 1972 order were those designed to protect the rights of mental health patients against the unfettered use of such extraordinary measures as electro-convulsive treatment, and isolation (or seclusion) and physical restraint. The second consent decree proposes several changes in the procedures governing physical restraint and seclusion designed to increase the protections for patients and to reflect current professional standards.[11] Revisions to the standards governing use of electro-convulsive treatment are addressed in the third decree.

The original *Wyatt* standard authorized the use of seclusion or restraint in both emergency and non-emergency situations but established different standards applicable to the two situations. In the absence of any emergency, the original standards permit a patient to be physically restrained or isolated on the written order of a QMHP who has "personally seen the patient concerned and evaluated whatever episode or situation is said to call for restraint or isolation." Such an order could remain in effect for a maximum of 24 hours, after which time it would need to be "renewed" if physical restraint and isolation were to be continued.[12] In an emergency, defined as a situation in which "it is likely that

---

**11.** In a footnote, the decree suggests that the plaintiffs and the defendants "may agree to apply a different standard" to the Eufaula Adolescent Center. Counsel for the parties have explained to the court that, because this facility is in a state of flux and because its future is thus uncertain, the parties were unable to agree on how the procedures governing restraint and seclusion should be modified to apply to it. The court understands from the parties that the Eufaula Adolescent Center will therefore continue to be governed by the existing procedures.

**12.** The existing standard also requires that the patient be seen by "qualified ward personnel" who will record the patient's physical and, if appropriate, psychological condition at least every hour; that the patient receive "bathroom privileges" every hour and be bathed every 12 hours; and that the patient be provided meals regularly.

patients could harm themselves or others," an order for restraint or isolation could be approved by any staff member for a period of up to one hour if the staff member found that "less restrictive means of restraint are not feasible." An emergency order for restraint or isolation could not extend beyond this initial one hour period unless a QMHP was consulted and entered an appropriate order in writing. 344 F.Supp. at 380.

█ Unlike the current standard, the revised standard makes clear that a patient may be physically restrained "only ... to prevent [the] patient from physically injuring himself/herself or others"; even non-emergency use of restraint or seclusion is governed by this requirement. It emphasizes that "[s]eclusion and restraint shall not be used as punishment or for the convenience of staff or in a manner that causes undue physical discomfort, harm or pain to the patient." The revised standard substantially limits the number of staff members authorized to order non-emergency seclusion or restraint: only a "qualified physician," defined as a psychiatrist or a licensed physician with specialized training, possesses this authority. The physician must be physically present and must perform an examination of the patient prior to issuing the order. Previously, the standard permitted a patient to be kept in seclusion or restraint for up to 24 hours on the basis of the initial order; the revised standard shortens this time to a maximum of eight hours. The new standard would also require that the patient be monitored every 15 minutes, as opposed to every hour under the present standard, and be bathed at least every 24 hours, rather than every 12 as is presently the rule. In response to the recommendations of advocacy groups, the standard also specifies that the staff member monitoring the patient shall be made aware of any special medical concerns regarding the patient so that these may be taken into account.

Like the 1972 order, the proposed decree recognizes an exception to the ordinary requirements when the use of isolation and physical restraint is required in "emergency situations." As with non-emergency orders, however, the procedural safeguards governing emergency restraint and seclusion are much improved. The existing standard does not require the involvement of medical personnel in implementing emergency seclusion and restraint, and permits the extension of emergency orders for up to 24 hours at a time as long as a QMHP is "consulted" within the first hour of the emergency episode and approves an extension of the order. This standard has been rewritten to ensure that even in "emergency" situations the use of seclusion and restraint is carefully controlled. As revised, the standard permits "a trained, clinically privileged, qualified registered nurse" to approve a seclusion or restraint order "in emergency situations when no qualified physician is available," but only if alternative treatment interventions "have been unsuccessful or would not prevent injury" and the use of seclusion or restraint is necessary "to prevent a patient from physically injuring himself/herself or others." [13] Before approving an order for seclusion or restraint, the nurse must be physically present and must evaluate the patient's condition "to the extent ... feasible"; this evaluation is to be documented in the patient's record. If all the preceding requirements are met, the nurse may order the use of seclusion or restraint for a period of up to one hour. The revised standard requires that a qualified physician be notified as soon as possible after the emergency episode begins, and that such a physician must see the patient in person within four hours—preferably, within one hour.

---

**13.** To meet the training standards, the nurse must be a QMHP registered nurse or a licensed registered nurse who has two years of clinical experience, has completed a basic ten-hour course addressing the use of psychopharmacology, psychopathology, and psychotherapeutic interventions (such as seclusion and restraint), and who obtains 20 hours of continuing professional education credits annually, half of them in areas relating to the treatment of patients with mental illness. The ten-hour educational course is to be developed by the Department of Mental Health and Mental Retardation in consultation with consumers and ex-patients.

A qualified doctor may verbally order that the emergency one-hour episode of seclusion or restraint be extended for up to four hours (three hours beyond the nurse's original order) if the doctor finds that this action is necessary to prevent physical injury to the patient. No emergency episode may last longer than four hours; after that time, any additional seclusion order must comply with the standard governing non-emergency use of seclusion and restraint. All written orders for seclusion and restraint, including emergency orders, must include a clinical assessment of the patient, the alternative treatment interventions attempted, and criteria for the release of the patient that relate to the original reasons for the intervention.

Finally, the revised standard adds requirements regarding the management of patients in seclusion and restraint. It mandates that patients be provided "fluids" as well as meals on a regular basis; that patients' vital signs must be taken "as clinically indicated"; and that patients in restraint must "be released for range of motion exercises as clinically indicated."

### C. The Third Consent Decree: Electro–Convulsive Treatment or "ECT"

#### (Standard 9(3))

As initially established in 1972, the *Wyatt* standards required only that a patient have given "express and informed consent" before any administration of electro-convulsive treatment or "ECT". *Wyatt,* 344 F.Supp. at 380. In 1980, however, the court instituted a fairly elaborate procedural mechanism for approving and administering the treatment.[14] This new procedure required that a QMHP trained and experienced in ECT use recommend the treatment in writing; that the recommendation be concurred in by another QMHP trained and experienced in its use and approved by the superintendent or medical director of the hospital and by the "Extraordinary Treatment Committee," a five-member court-appointed body; and that the

patient give written, informed consent. The procedure placed a number of significant responsibilities on the Extraordinary Treatment Committee, including that it certify that the patient's consent was actually "knowing, intelligent, and voluntary", ascertain that the proposed treatment constituted the "least drastic alternative available", "give great weight to any expression by the patient of a desire not to be subjected to ECT", and resolve "[a]ny doubts that ECT is in the best interest of the incompetent patient ... against proceeding with such treatment." Finally, the court required that each patient be represented throughout these proceedings by an independent attorney.

In the case of a patient incompetent to give informed consent, the 1980 order mandates alternative procedures for obtaining approval of ECT. If such an individual is deemed incompetent by either his or her attorney, treating psychiatrist, or the Extraordinary Treatment Committee, the Committee may consent to such treatment on the patient's behalf if, after a comprehensive evaluation of the patient and his or her records, and taking account of the wishes of the patient, the patient's family members, and the hospital staff, it finds that the treatment would be in the patient's best interest. Either the patient or a family member may seek court review of such a decision before ECT is begun.

Once such treatment has been approved, the 1980 order also constrains how it may be administered. First, within ten days prior to the beginning of each series of ECT, the patient must receive a complete physical and neurological examination. Second, such treatment may only be administered by a QMHP psychiatrist, trained and experienced in the use of ECT, or by "qualified personnel" under the "direct supervision and in the physical presence" of such trained psychiatrist. Third and finally, a competent patient is entitled to with-

---

**14.** *Wyatt v. King,* civil action no. 3195–N (M.D.Ala. July 25, 1980). The court adopted this new standard "for the purpose of eliminating any confusion or ambiguity and to continue the procedural safeguards that must accompany the use of extraordinarily or potentially hazardous modes of treatment on patients in the state's mental institutions." *Id.* at 1.

draw his or her consent to such treatment at any time and for any reason.

In the proposed consent decrees submitted to the court last year, which the court refused to approve, the parties sought to make substantial modifications in the procedures for ECT. In particular, the proposed decrees placed the entire process under independent judicial supervision by eliminating the Extraordinary Treatment Committee and transferring to state courts the responsibility for determining a patient's competency to consent to treatment and approving the administration of ECT. Furthermore, because counsel for the parties assumed that state courts would continue to appoint counsel in cases such as these, the proposed decrees eliminated the Department's obligation to provide each patient with an independent attorney. In addition, among other things, the decrees required that a consulting psychiatrist, not affiliated with either the Department or the treating psychiatrist, examine the patient and concur in the recommendation for ECT, and the decrees recognized a new category of "emergency" ECT for situations in which the delay inherent in ordinary procedures could be expected to jeopardize the patient's life or cause the patient serious physical harm.

Although the parties' counsel believed the proposed modifications on the whole strengthened the protections provided to patients, some consumers and advocacy groups voiced a number of concerns, in particular about the elimination of the Extraordinary Treatment Committee. In response to these concerns, the parties have proposed a new decree which, like the earlier proposals, still strengthens the protections provided to patients, but does so through less radical revisions to the procedures governing ECT.

■ The proposed decree preserves the Extraordinary Treatment Committee but provides that it shall be "reconstituted" by the court to ensure that consumers or ex-patients are represented as committee members.[15] Although the above-listed substantial responsibilities of the Committee are conspicuously absent, these concerns have not been overlooked: the decree provides that the court is to "prescribe rules of the Committee's functioning." The decree further limits those who may prescribe ECT to "a psychiatrist ... who has training regarding the appropriate use of ECT, has conducted a thorough mental and physical examination of the patient, and reviewed the medical records available." The revised standard also spells out more clearly the information that must be provided a patient before the patient's informed consent may be obtained. This provision reflects the concerns expressed by some class members that, in the past, patients may have consented to ECT without fully understanding the potential side effects. The protections established by the court in 1980 for non-emergency ECT should be, depending upon the oversight duties ultimately assigned to the reconstituted Extraordinary Treatment Committee, somewhat strengthened with the implementation of the decree.

The revised standard provides for the administration of ECT to a patient who is not competent to consent to treatment and for whom no guardian has been appointed, in certain "emergency" situations. In the absence of a consent obtained according to the standard described above, ECT may be administered only when the treating psychiatrist has documented, and the Extraordinary Treatment Committee confirmed, that the following conditions are met: (1) the patient's condition has deteriorated; (2) the patient has failed to respond to alternative forms of treatment; and (3) a delay in treatment "could reasonably be expected to jeopardize the life of the patient or to result in serious physical harm to the patient." Before invoking this emergency provision, the treating psychiatrist must first notify the Department's Internal Rights Advocacy and Protection Program

---

15. The exact composition of the reconstituted committee is left for the court to determine, with the assistance of the parties, after approval of the revised decrees. The Committee would continue to function in its present form until the changes contemplated by the revised standard are implemented.

and must diligently petition the state court to appoint a guardian or provide judicial authorization for the treatment. Only if the psychiatrist is unable to secure a decision from the state court may the "emergency" treatment proceed.[16] Finally, the revised standard directs the Internal Rights Advocacy and Protection Program to conduct an annual review of all administrations of ECT, both emergency and non-emergency.

The court recognizes that not all class members are happy with the revised standard. Although the use of ECT has gained increased acceptance in the medical community since the court first established procedures governing its use in 1972, it continues to generate controversy among members of the mental health community. Testimony submitted to the court confirms that, other than seclusion and restraint, ECT is the treatment modality of greatest concern to consumers. The court heard from a number of consumers and advocates who object to any use of "emergency" ECT on patients unable to give voluntary consent. These critics assert that ECT is a very invasive form of therapy which carries serious side effects, most notably memory loss, even when appropriately used. In light of these risks, critics of the "emergency" use provision would have preferred that the standard be modified to prohibit such use altogether. And although the focus of most objections centered upon "emergency" use of the treatment, critics have also sought increased assurance that the treatment will be used only as therapy of last resort, and that patients who consent to treatment will be provided with full information about the treatment and its risks.

For the most part, however, even critics of ECT agreed with the court that the revised standard represents an improvement over the existing *Wyatt* standard.[17] The decree retains existing patient safeguards, such as the appointed attorney and the Extraordinary Treatment Committee, and establishes some additional protections. The exception for "emergency" treatment is narrowly defined and should not result in any increased use of the therapy. Finally, the court notes that this standard has been modified in the past and, if necessary, may be revised again in the future, as medical knowledge about the risks and benefits of ECT indicates that further revision would better protect the interests of the state's mental health patients.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court that the joint request for entry of consent decrees filed by plaintiffs and defendants on January 10, 1991, be and it is hereby granted to the extent that the three new proposed consent decrees, submitted to the court on October 15, 1991, and later revised, are approved and entered this date.

## CONSENT ORDER I

The plaintiffs and defendants have agreed that certain definitions and standards contained in the Court's prior orders regarding the care and treatment of persons with mental illness should be modified to both enhance the treatment of class members and better protect their rights. They have asked the Court to approve these modifications. For the reasons set forth in the Memorandum Opinion entered

---

**16.** To avoid the prospect of repeated "emergency" orders approving the use of ECT, the standard directs that if the treating psychiatrist anticipates that future ECT treatments may be indicated, the psychiatrist must make "diligent efforts" following the emergency treatment to obtain a judicial determination of the patient's competency and, if necessary, the appointment of a guardian.

**17.** The plaintiff-intervenors remain opposed to federal court involvement in the administration of ECT, fearing that the proposed decree will encourage the Department to "bypass" state law

protections regarding informed consent. The plaintiff-intervenors also question the need for this provision, contending that it is based solely on anecdotal evidence that, on occasion, some state courts have failed to process emergency requests expeditiously. The court assumes that the defendants will comply with the standards in making "diligent" efforts to secure a state court decision, and that this provision will therefore be invoked infrequently, if at all. Informed consent will remain primarily an issue for the state courts to resolve.

this date, the modifications will be approved.

Accordingly, it is ORDERED, ADJUDGED AND DECREED that the definitions section of the *Wyatt* standards concerning the care and treatment of persons with mental illness and Standards 21, 23, 26, 27, 28, 29, 31, and 33 concerning the care and treatment of persons with mental illness be and are hereby AMENDED as set out in the Appendix to this order.

## APPENDIX TO CONSENT ORDER I OF MAY 14, 1992

### Modifications of Standards Governing Care and Treatment of Class Members with Mental Illness

#### Definitions

a. "Facility"—One of the inpatient institutions for persons who are mentally ill operated by the Department of Mental Health/Mental Retardation, including hospitals, the Thomasville Adult Adjustment Center, and the Eufaula Adolescent Center.

b. "Hospital"—Bryce Hospital, Searcy Hospital, North Alabama Regional Hospital, and Greil Memorial Hospital, and any other state hospital operated by the Department of Mental Health and Mental Retardation in which class members reside.[1]

c. "Patients"—All persons who are now confined and all persons who may in the future be confined to any facility operated by the Alabama State Department of Mental Health/Mental Retardation pursuant to an involuntary civil commitment procedure.

d. "Qualified Mental Health Professional"—

(1) a psychiatrist with three years of residency training in psychiatry;

(2) a psychologist with a doctoral degree from an accredited clinical psychology program; or a psychologist with a doctoral degree from another accred-

ited applied psychology program (e.g. counseling) who is licensed to practice within the state and who has one year of clinical experience under the supervision of a QMHP clinical psychologist;

(3) a psychological assistant (i) with a master's degree in psychology from an accredited clinical program offering specialized training in abnormal behavior and with two years of clinical experience under the supervision of a doctoral level clinical psychologist and (ii) who practices under the supervision of a doctoral level clinical psychologist;

(4) a psychological assistant with a master's degree in psychology who (i) has training in abnormal behavior, (ii) has two years of clinical experience under the supervision of a doctoral level clinical psychologist, (iii) is employed in a facility on the date of the Consent Order adopting this Appendix, and (iv) who practices under the supervision of a doctoral level clinical psychologist;[2]

(5) a social worker with a doctorate or master's degree from an accredited program and two years of clinical experience under the supervision of a QMHP;

(6) a registered nurse with a graduate degree in psychiatric nursing and two years of clinical experience under the supervision of a QMHP; and

e. "Non–QMHP Staff Member"—An employee of a facility, other than a QMHP, whose duties require direct contact with or supervision of patients.

#### Standard 21

(21) Each Qualified Mental Health Professional shall meet all licensing and certifi-

---

1. There is a long-standing dispute between the parties concerning whether the *Wyatt* standards are applicable to the Taylor Hardin Secure Medical Facility. This Consent Order is not intended to take a position on the matter, but instead to leave the question open to future judicial resolution if necessary. The Court understands that the parties have no intention to request such a resolution in the foreseeable future.

2. This provision affects no more than 9 psychological assistants now employed by the Department. These nine, and only these nine, would attain QMHP status as a result of this provision.

cation requirements promulgated by the State of Alabama, if any, for persons engaged in private practice of the same profession elsewhere in Alabama.[3] Other staff members shall meet the same licensing and certification requirements promulgated by the State of Alabama, if any, as persons who engage in private practice of their specialty elsewhere in Alabama. Notwithstanding the preceding, psychiatrists who have proven their proficiency in the practice of medicine by the successful completion of required examinations and who have been approved and granted a limited institutional license by the State Board of Medical Examiners may be employed for up to one year.

### Standard 23

(23) Each non-QMHP staff member shall be under the supervision of a QMHP appropriate to the work assignment and professional discipline of that non-QMHP staff member. Additionally, the treatment of each patient shall be supervised by a QMHP, and the non-QMHP staff members involved in carrying out treatment activities prescribed in the patient's treatment plan shall be responsible to that QMHP.

### Standard 26

(26) A. *Individualized Treatment Plan Development and Implementation.*

Each patient shall have an individualized treatment plan developed by an assigned Treatment Team. The team shall actively involve the patient, and with the patient's permission, the patient's family, in developing the plan. Teams in treatment programs within a hospital must be headed by a psychiatrist, and teams in geriatric programs and in treatment programs in the Thomasville Adult Adjustment Center and the Eufaula Adolescent Center must be headed by an appropriate QMHP. The treatment plan shall be developed and implemented as soon as possible. At a mini-

mum: within 72 hours of admission, a designated member of the Treatment Team shall develop a treatment plan based on, at least, an assessment of the patient's presenting problems, physical strength, emotional status, and behavioral status; and within ten days, a full individualized treatment plan shall be developed.

Each individualized treatment plan (other than the 72–hour plan), regardless of facility, shall contain:

(1) A statement of the nature of the specific problems and specific needs of the patient;

(2) A statement of the patient's strengths including skills and interests;

(3) A statement of the least restrictive treatment conditions necessary to achieve the purposes of commitment and the goals of the treatment plan;

(4) A description of intermediate and long term treatment goals which relate to involuntary commitment criteria, with a projected timetable for their attainment;

(5) A specification of staff responsibility and a description of proposed staff involvement with the patient in order to attain these treatment goals;

(6) Specific and measurable criteria for release to less restrictive treatment conditions, and specific and measurable criteria for discharge which relate to involuntary commitment standards. These criteria shall be written in nontechnical language and shall be explained to the patient in a manner appropriate to the patient's capacity to understand.

(7) A notation of any therapeutic tasks and labor to be performed by the patient in accordance with Standard 18, *supra;*

(8) An assessment by medical staff of any restrictions or limitations on physical activity;

(9) An individualized discharge plan developed concurrently with the individual-

---

**3.** This standard does not require that a social worker in a facility have a license for private independent practice (commonly referred to as a "P.I.P." license). It is sufficient that the social worker be licensed by the relevant state agency for private social work practice under the supervision of an appropriate professional.

ized treatment plan that identifies the residential, clinical, social and vocational services the patient will require upon discharge.

### B. *Individualized Treatment Plan Supervision.*

A QMHP and a psychiatrist shall be responsible for supervising the implementation of the treatment plan, integrating the various components of the treatment program, reviewing the treatment plan on a regular and periodic basis, and recording the patient's progress. The QMHP shall be responsible for ensuring that the patient is released, where appropriate, into a less restrictive form of treatment. The QMHP shall ensure that, upon discharge, the patient is linked to an appropriate community mental health center and is given access to case management services.

### C. *Progress Summaries.*

Summaries of the patient's progress shall be recorded on a regular and periodic basis by a QMHP. The progress summaries shall include a medication review by the attending psychiatrist or physician that specifically addresses, among other things, the extent to which the prescribed medication is achieving its intended purposes and the presence of unintended side effects. A summary of the extent and nature of the patient's work activity shall also be included, if applicable. The frequency and regularity with which the patient's progress is noted should be dictated by good clinical judgment. Factors affecting the exercise of such judgment should include changes in the patient's condition and/or the need to document observations that affect treatment planning. At a minimum, progress summaries shall be recorded as follows:

(1) Weekly summaries for patients in short-term treatment programs (programs of up to 180 days)[4] and in adolescent treatment programs;[5]

(2) Monthly summaries for patients in long-term treatment programs (programs of more than 180 days);[6]

(3) Monthly summaries for geriatric patients.

### D. *Individualized Treatment Plan Review and Modification.*

Modifications in the individualized treatment plan shall be made by the Treatment Team as the need becomes evident through regular and periodic reviews.

At a minimum, the treatment plan shall be reviewed at major key decision points in the patient's treatment, including: at the time of admission, transfer, and discharge; when there is a major change in the patient's condition; at the point of estimated length of treatment and thereafter based on that estimated length of treatment; and at least every three months.

### E. *Quality Assurance/Utilization Review.*

Each facility shall have a Quality Assurance Program that provides for all treatment plans to be reviewed in accordance with JCAHO standards and a Utilization Review Program that requires that all patients be screened for appropriateness of admission to the facility according to specific criteria, including whether the patient meets the standards for commitment. The Utilization Review program shall also require that the facility review a patient's need for continued inpatient treatment according to a schedule based on the average length of stay for the unit or program in which the patient is being treated.[7] The

---

4. Currently, these programs include the North Alabama Regional Hospital, the Greil Memorial Hospital, and the admissions units at Bryce and Searcy Hospitals.

5. Currently, the only such program is the adolescent unit at Bryce Hospital.

6. Currently, the Eufaula Adolescent Center and the Thomasville Adult Adjustment Center are considered long-term treatment programs, as

are Bryce and Searcy Hospitals, except their admissions units.

7. The requirement that "the facility review a patient's need for continued inpatient treatment according to a schedule based on the average length of stay for the unit or program in which the patient is being treated" applies *only* when such data is readily available. When it is not, length of stay data for the facility will be used.

need for continued inpatient treatment shall be judged against specific criteria, including whether the patient continues to meet the standards for commitment. As part of the screen for appropriateness of admission and as part of the continued stay reviews, the facility shall document the specific basis for a determination that a patient needs to be admitted or continues to need institutional care.

If, as a result of the screen for appropriateness of admission or a continued stay review, it is determined that a patient does not require inpatient treatment in accordance with the standards for commitment, the patient must be released immediately unless he or she agrees to continue treatment on a voluntary basis. In addition, if at any time the director of the facility or his appointed, professionally qualified agent at any time determines that a patient does not require inpatient treatment in accordance with the standards for commitment, the patient must be discharged immediately unless he or she agrees to continue treatment on a voluntary basis. Upon discharge, the patient will be linked to an appropriate community mental health center and given access to case management services unless not clinically indicated.[8]

### Standard 27

Standard 27 is deleted.

### Standard 28

Standard 28 is deleted.

### Standard 29

Standard 29 is deleted.

### Standard 31

(31) Confidentiality of the patient record shall be protected through strict adherence to applicable statutes and rules. Notwithstanding the preceding, the following shall

---

**8.** The parties anticipate that such linkage and access may not be clinically indicated in all cases in which a person is discharged on the basis that he/she is an inappropriate admission.

have access to a patient's record: (a) the patient; (b) the patient's guardian; (c) individuals properly authorized in writing by the patient or the patient's guardian; (d) attorneys for the plaintiff class and their designated agents; (e) the Alabama Disabilities Advocacy Program, or its successor, in accordance with applicable law; and (f) properly authorized employees of the Alabama Department of Mental Health and Mental Retardation, including the staff of the Department's Internal Rights Protection and Advocacy Program. The record shall include at a minimum:

a. Identification data, including the patient's legal status;

b. A patient history, including but not limited to:

(1) Family data, educational background, and employment record;

(2) Prior medical history, both physical and mental, including prior hospitalization;

c. The chief complaints of the patient and the chief complaints of others regarding the patient. The chief complaints of others shall be discussed with the patient, and the patient's response shall be documented along with the complaints;

d. An evaluation that notes the onset of illness, the circumstances leading to admission, attitudes, behavior, estimate of intellectual function, memory function, orientation, and an inventory of the patient's assets in descriptive, not interpretative, fashion;

e. A summary of each physical examination that describes the results of the examination;

f. A copy of the individualized treatment plan and any modifications thereto;

g. A copy of the individualized discharge plan and any modifications thereto, and a summary of the steps

---

In some of these cases, the person may not be mentally ill or may not require community mental health or case management services upon discharge.

that have been taken to implement that plan;

h. A medication history and status, including the signed orders of the prescribing physician. Nurses shall indicate by signature that orders have been carried out;

i. A detailed summary of each significant contact by a Qualified Mental Health Professional with the patient;

j. The periodic summaries by the supervising QMHP of the patient's progress required by Standard 26, *supra*, including the summaries of the extent and nature of the patient's work activities;

k. A signed order by a QMHP for any restrictions on visitation and communication, as provided in Standards 4 and 5, *supra;*

l. A signed order by a qualified physician for any physical restraints or seclusion, as provided in Standard 7, *supra;*

m. A detailed summary of any extraordinary incident in the facility involving the patient to be entered by a staff member noting that he has personal knowledge of the incident or specifying his other source of information, and initialed within 24 hours by a QMHP;

n. A summary of the findings of the screen of appropriateness of admission and of the continued stay reviews required by Standard 26, *supra*, and a summary of any finding by the director or his or her appointed agent that the patient does not require inpatient treatment in accordance with the standards for commitment.

### Standard 33

Standard 33 is deleted.

### CONSENT ORDER II

The plaintiffs and the defendants have agreed that Standard 9(3) contained in the Court's prior orders regarding the care and treatment of persons with mental illness should be modified to both enhance the treatment of class members and better protect their rights. They have asked the Court to approve the modification. For the reasons set forth in the Memorandum Opinion entered this date, the modification will be approved.

Accordingly, it is ORDERED, ADJUDGED AND DECREED that Standard 9(3) concerning the care and treatment of persons with mental illness be and is hereby AMENDED as set out in the Appendix to this order.

### APPENDIX TO CONSENT ORDER II OF MAY 14, 1992

Modifications of Standard 9(3) Governing Care and Treatment of Class Members with Mental Illness

### Standard 9(3)

Patients may be administered electroconvulsive treatment (ECT) provided the following conditions are met prior to implementing each course of treatment.

Basic Requirements

1. The patient is 19 years of age or older.

2. The treatment is prescribed by a psychiatrist licensed in the State of Alabama who has training regarding the appropriate use of ECT, has conducted a thorough mental and physical examination of the patient, and has reviewed the medical records available.

3. The Extraordinary Treatment Committee concurs in the recommendation of treatment. The Committee shall be reconstituted by the Court, after reviewing recommendations by the plaintiffs and the defendants for the Committee's reconstitution. In reconstituting the Committee, the Court will provide for representation on the Committee of consumers and/or ex-patients. The Court shall also prescribe rules for the Committee's functioning.

4. The clinical director of the facility has approved the decision to treat with ECT.

5. The treatment is administered by a psychiatrist who is specially trained in the use of ECT. Unless medically contraindicated, anaesthesia and muscle relaxants are administered by a qualified anaesthetist or anesthesiologist or by a physician skilled in this procedure.

6. Regressive or depatterning electroconvulsive techniques are not utilized.

7. Complete, accurate, and contemporaneous records are maintained with respect to each administration of ECT.

8. Consent has been obtained in accordance with paragraphs # 9–# 12, or the emergency administration of ECT is permitted under paragraphs # 13–# 15 below.

*Consent*

9. For a competent patient (i.e., a patient who is capable of giving informed consent to ECT): [1]

a. The patient has been fully informed by the treating psychiatrist (in language and in a manner appropriate to the patient's condition and capacity to understand) of the nature, risks and consequences of ECT, including the possibility of memory loss; of the patient's right to revoke his consent at any time, including during the course of the treatment; and of specific means by which the patient may revoke his consent (e.g., by orally informing the treating psychiatrist or other staff, by calling a specific telephone number, by returning a pre-printed form, etc.); and

b. The patient has consented in writing to the treatment.

10. If the patient has been judicially determined to be incompetent to consent to treatment (e.g., a court has appointed for the patient a general guardian or a limited guardian with power to consent to treatment), and the patient has not regained competency before or during the proposed course of ECT treatment:

a. The patient has been informed of the nature of the treatment in language and in a manner appropriate to the patient's condition and capacity to understand; and

b. Consent has been obtained in writing from the patient's guardian [2] after the guardian has been informed of the risks and benefits of the treatment, of the legal guardian's right to revoke consent at any time, and of specific means for revoking consent (e.g., by orally informing the treating psychiatrist or other staff, by calling a specific telephone number, by returning a pre-printed form, etc.).

11. If the patient has been judicially determined to be incompetent to consent to treatment (e.g., a court has appointed for the patient a general guardian or a limited guardian with power to consent to treatment), but the patient has regained competency before or during the proposed course of ECT treatment (regardless of whether the patient's guardian has consented to the treatment):

a. The patient has been fully informed by the treating psychiatrist (in language and in a manner appropriate to the patient's condition and capacity to understand) of the nature, risks and consequences of ECT, including the possibility of memory loss; of the patient's right to revoke his consent at any time, including during the course of the treatment; and of specific means by which the patient may revoke his consent (e.g., by orally informing the treating psychiatrist or other staff, by calling a specific telephone number, by returning a pre-printed form, etc.); and

b. The patient has consented in writing to the treatment.

12. If a patient has not been judicially determined to be incompetent to consent to treatment, but the treating psychiatrist believes the patient may not be competent to consent:

a. The treating psychiatrist has caused a formal request (e.g. petition, motion, etc.) to be filed in a court of competent jurisdiction for adjudication of the patient's competence to consent to treatment; [3] and

---

**1.** A psychiatrist may consider a patient to be "competent" when the psychiatrist reasonably believes the patient to be capable of giving informed consent to ECT.

**2.** As used in this standard, a "guardian" includes any person authorized by a court of competent jurisdiction to consent on behalf of the patient to the administration of ECT.

**3.** Each such formal request filed in court must ask the court to appoint counsel for the patient whose competence is at issue.

b. Either:

(i) The court has appointed a guardian and the requirements of paragraph # 10 have been met; or

(ii) The court itself has authorized the treatment and the requirements of paragraph # 10a have been met.

*Emergency Administration*

13. Notwithstanding paragraphs # 9–# 12 above, patients may be administered ECT in an emergency if the following conditions have been met:

a. The treating psychiatrist has documented, and the Extraordinary Treatment Committee has found, that: (i) the patient is not competent to consent to treatment and is without a guardian; (ii) the patient's condition has deteriorated, (iii) the patient has failed to respond to alternative forms of treatment, (iv) a delay in treatment could reasonably be expected to jeopardize the life of the patient or to result in serious physical harm to the patient; and

b. The treating psychiatrist has:

(i) Notified the Department's Internal Rights Advocacy and Protection Program of his or her decision; and

(ii) Been unable to secure a decision on the appointment of a guardian or a judicial authorization from a state court to administer ECT on an emergency basis, despite diligent efforts on his part and the part of legal counsel for the Department.[4]

14. If the treating psychiatrist believes that the patient may require additional ECT treatment in the future, the Department must make diligent efforts following the emergency treatment to obtain a judicial determination of whether the patient is competent to consent and, if it is determined that the patient is not competent, to obtain the appointment of a guardian to consent to treatment or a judicial authorization for future ECT treatments.

---

**4.** Requests filed with the court for the appointment of a guardian or judicial authorization to administer ECT must ask the court to appoint counsel for the patient whose competence is at issue.

*Review by Internal Advocacy Program*

15. The Department's Internal Rights Advocacy and Protection Program shall annually review all administrations of ECT (i.e., emergency administrations, administrations to consenting competent patients, and administrations to incompetent patients when a guardian or court has given consent).

## CONSENT ORDER III

The plaintiffs and the defendants have agreed that Standard 7 contained in the Court's prior orders regarding the care and treatment of persons with mental illness should be modified to both enhance the treatment of class members and better protect their rights. They have asked the Court to approve the modification. For the reasons set forth in the Memorandum Opinion entered this date, the modification will be approved.

Accordingly, it is ORDERED, ADJUDGED AND DECREED that Standard 7 concerning the care and treatment of persons with mental illness be and is hereby AMENDED as set out in the Appendix to this order.

### APPENDIX TO CONSENT ORDER III OF MAY 14, 1992

Modifications of Standard 7 Governing Care and Treatment of Class Members with Mental Illness

*Standard 7*[1]

(7) A. *Standard for Seclusion or Restraint.* Patients have a right to be free from seclusion and physical restraint. Patients may be placed in seclusion or physically restrained only (a) to prevent a patient from physically injuring himself/herself or others, (b) after alternative treatment interventions have been unsuccessful or after determining that alternative treatment interventions would not be practicable, and (c) when authorized by a written

---

**1.** In the case of the Eufaula Adolescent Center, the plaintiffs and the defendants may agree to apply a different standard.

order of a qualified physician [2] who is physically present and has examined the patient. No order for seclusion or restraint may exceed eight hours.

B. *Exceptions.* Exceptions to the requirement that seclusion and restraint be implemented only pursuant to a written order of a qualified physician who is physically present and has examined the patient may be made in emergency situations when no qualified physician is available. In such situations, the use of restraint or seclusion may be implemented for up to one hour by a trained, clinically privileged, qualified registered nurse [3] to prevent a patient from physically injuring himself/herself or others, after determining that alternative treatment interventions have been unsuccessful or would not be practicable. The nurse must be physically present and evaluate the patient's physical condition to the extent that it is feasible and document the evaluation in the clinical record. A qualified physician should be notified as soon as possible after the emergency episode of seclusion or restraint. A qualified physician should see the patient within four hours of the initiation of seclusion or restraint and preferably within one hour. The emergency episode of seclusion or restraint may be extended up to four hours

(i.e. three hours beyond the initial one hour authorized by the qualified registered nurse) upon verbal order of a qualified physician if necessary to prevent a patient from physically injuring himself/herself or others and if, in the opinion of the qualified physician, alternative treatment interventions would be unsuccessful in preventing injury. After the emergency episode has extended for four hours, the patient must be released unless a qualified physician writes a new order for seclusion or restraint that meets the criteria in paragraph A(a-c) above. All emergency seclusion or restraint orders (including any related documentation) must be reviewed and signed by a qualified physician within twelve hours of the initial use of seclusion or restraint.

C. *Orders for Seclusion or Restraint.* All written orders for seclusion and restraint (including in emergency situations) shall include a clinical assessment of the patient, the alternative treatment interventions attempted, and criteria for the release of the patient which shall relate to the standard for seclusion or restraint in paragraph A above. When the criteria for release have been met or at the end of the period set out in the order (whichever occurs first), the patient must be released unless the patient is then examined by a

---

**2.** A "qualified physician" means, for purposes of this Standard:

   (a) a psychiatrist; or
   (b) a licensed physician (i) who has completed a basic 10–hour review course in psychiatry, including psychopharmacology, psychopathology, psychotherapeutic interventions (e.g., the use of seclusion/restraint), interviewing, and assessment of mental status; (ii) who obtains a minimum of twenty hours of continuing medical education per year; and (iii) who has demonstrated his abilities to the satisfaction of a supervising psychiatrist, resulting in his being granted by the Medical Staff clinical privileges as a qualified physician.

The 10–hour review course shall be developed by the Department of Mental Health/Mental Retardation in consultation with consumers and ex-patients.

**3.** A "qualified registered nurse" means, for purposes of this Standard:

   (a) a QMHP registered nurse; or
   (b) a licensed registered nurse (i) who has two years of clinical experience in an inpatient psychiatric setting under the supervision of a QMHP nurse and/or a psychiatrist; (ii) who has completed a basic 10–hour course that includes psychopharmacology, psychopathology, and psychotherapeutic interventions (e.g., the use of seclusion/restraint), interviewing, and assessment of mental status; and (iii) who obtains 20 hours of continuing professional education credits annually, 10 of which concern the treatment of persons with mental illness.

The 10–hour review course shall be developed by the Department of Mental Health/Mental Retardation in consultation with consumers and ex-patients.

qualified physician who writes a new order for seclusion or restraint.

D. *Management of Patients in Seclusion or Restraint.* A documented observation shall be made of a patient in restraint or seclusion at least every fifteen minutes. The person making the observation shall be made aware of and shall take account of any special medical concerns regarding the patient. The patient must be given bathroom privileges at least every hour, must be bathed at least every twenty-four hours or more frequently if necessary, and must be provided meals and fluids on a regular basis. Vital signs shall be taken as clinically indicated. Patients in restraint shall be released for range of motion exercises as clinically indicated.

E. *Additional Matters.* Seclusion and restraint shall not be used as punishment or for the convenience of staff or in a manner that causes undue physical discomfort, harm, or pain to the patient. PRN orders for seclusion and restraint are prohibited.